# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEANNETTE FRETT | : | |
| 6025 Western Avenue, N.W. | : | |
| Washington, District of Columbia 20015 | : | |
| | : | COMPLAINT |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HOWARD UNIVERSITY | : | |
| 2400 Sixth Street, N.W. | : | |
| Washington, District of Columbia 20059 | : | |
| | : | |
| and | : | |
| | : | |
| DR. SIDNEY A. RIBEAU, | : | |
| PRESIDENT OF HOWARD UNIVERSITY | : | |
| Office of the President | : | |
| 2400 Sixth Street, N.W. | : | |
| Washington, District of Columbia 20059 | : | |
| | : | |
| and | : | |
| | : | |
| BOARD OF TRUSTEES | : | |
| OF HOWARD UNIVERSITY | : | |
| Office of the Secretary | : | |
| 2400 Sixth Street, N.W. | : | |
| Washington, District of Columbia 20059 | : | |
| | : | |
| and | : | |
| | : | |

HONORABLE L. DOUGLAS WILDER,          :
CHAIRMAN OF THE AUDIT AND LEGAL       :
COMMITTEE OF                          :
THE BOARD OF TRUSTEES                 :
OF HOWARD UNIVERSITY                  :
Office of the Secretary               :
2400 Sixth Street, N.W.               :
Washington, District of Columbia 20059 :
                                      :
        and                           :
                                      :
JAMES "JIMMY" JONES                   :
FORMER CHIEF HUMAN RESOURCES          :
OFFICER AND CABINET OFFICER OF        :
HOWARD UNIVERSITY                     :
1814 Thirteenth Street, N.W.          :
Washington, District of Columbia 20009 :
                                      :
        Defendants.                   :          JURY TRIAL DEMANDED
…………………………………………...……… :

Plaintiff JEANNETTE N. FRETT, through her attorneys, CATHARINE E. EDWARDS

and SHARON Y. EUBANKS, respectfully submits to this Court and alleges as follows:

### COMPLAINT AND NATURE OF THE CASE

1.     Plaintiff Jeannette Frett (hereinafter "Plaintiff" or "Ms. Frett"), a former employee

of Howard University, brings this action against Howard University, the President of Howard

University (namely, Dr. Sidney A. Ribeau), the Board of Trustees of Howard University, the

Chairman of the Audit and Legal Committee of the Board of Trustees (namely, Honorable L.

Douglas Wilder), and Former Executive Vice President and Chief Human Resources Officer of

Howard University (namely, James "Jimmy" Jones), (collectively "Defendants") to redress

issues of hostile work environment and skin-color and gender discrimination against Ms. Frett during her employment at Howard University.

2.     Ms. Frett brings this action to remedy issues of hostile work environment and discrimination on the basis of skin-color and gender, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, as amended (hereinafter "Title VII") and the District of Columbia Human Rights Act, D.C. Code § 2-1402.11.

3.     Furthermore, pursuant to Title VII's protections against employer retaliation, 42 U.S.C. § 2000e-3(a), Ms. Frett brings this action to remedy retaliation against her by Defendants, resulting from her filing of an internal Equal Employment Opportunity ("EEO") complaint, a formal Equal Employment Opportunity Commission ("EEOC") charge, and a complaint with the Howard University Board of Trustees against Defendant-Howard University and Defendant-Jones for hostile work environment and discrimination based on her skin color and gender. As set forth below, Defendants retaliated against Ms. Frett by compelling her, the subject of the discrimination, to take administrative leave from her position with the University and by placing her on it over her objections as a result of her filing an EEO complaint against Defendant-Howard University and Defendant-Jones. Defendant-Jones remained in his position; he was not required to take administrative leave. Nor were men, particularly Tyrone Pitts, Director Payroll, required to take administrative leave after filing a charge earlier in the year. While on administrative leave, Ms. Frett filed a formal EEOC charge with the United States Equal Employment Opportunity Commission. Defendants further retaliated against Ms. Frett by firing her from the University immediately upon her return from administrative leave. These acts of retaliation occurred following Ms. Frett's internal complaints revealing unlawful and unethical behavior within the University. Ms. Frett's complaints in this regard were made to Antwan

Lofton, the Director of the Office of Equal Employment Opportunity & Diversity for Howard University and Hospital, to Norma Leftwich, former General Counsel for Howard University and Hospital, and to Defendant-Jones, former Executive Vice President and Chief Human Resources Officer.

4.       Additionally, this is a civil action by Ms. Frett against Defendants under the whistleblower protection provisions of the federal False Claims Act, 31 U.S.C. § 3730(h).  As set forth below, Defendants retaliated against Ms. Frett by means of placing her on administrative leave and ultimately firing her after she, while acting within the scope of her employment responsibilities, reported information raising issues of fraud, waste, and abuse to Caroll Little, Internal Auditor of Howard University.  The information Ms. Frett reported to Internal Auditor Caroll Little demonstrated that Howard University engaged in a pattern and practice of violating federal I-9 immigration laws and the Employee Retirement and Income Security Act ("ERISA") requirements, as well as conflicts of interest between the University and one of its contractors, PRM Consulting Group, and about the mismanagement of University funds.

### JURISDICTION, VENUE, and STATUTE OF LIMITATIONS

5.       This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 (federal question) because the suit is based on (Counts I and III) employment discrimination in violation of Title VII, 42 U.S.C. § 2000d, e-2, e-5(f), *et seq.*, as amended and the Federal Equal Pay Act, 29 U.S.C. § 206(d)(1).  This Court also has subject matter jurisdiction over this suit because the suit is based on (Counts IV and V) employer retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the whistleblower protection provisions of the Federal False Claims Act, 31 U.S.C. §§ 3730(h), 3732(a).  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 (Count II).

6.      Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3), and 31 U.S.C. § 3732(a).  Pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue in this Court is proper because the unlawful employment practices are alleged to have been committed in the judicial district of the District of Columbia, which is also where the aggrieved person would have worked but for the unlawful employment practice.   Under 31 U.S.C. § 3732(a), venue in this Court is proper because at least one of the Defendants (e.g., Defendant-Howard University) can be found, resides, or transacts business in the District of Columbia, where the False Claims Act retaliation occurred.

7.      This complaint, being filed today, is within the statute of limitations provided by 42 U.S.C. § 2000e-5(e)(1) and D.C. CODE § 2-1402.11.

## PROCEDURAL HISTORY

8.      Plaintiff timely filed a Charge of Discrimination with the EEOC on March 27, 2012 (Charge No.: 570-2012-01140) and supplemented that charge with additional charges for discrimination, hostile work environment, and retaliation on June 8, 2012.   On January 29, 2013, the EEOC Washington Field Office issued a Notice of Right to Sue to Ms. Frett.

## PARTIES

I.     **Plaintiff**

**Jeannette Frett, Former Chief Talent Officer and Human Resources Business Partner of Howard University**

9.      Plaintiff Jeannette Frett is a 52-year-old African American female currently residing in Washington, District of Columbia.  Howard University hired Ms. Frett as a consultant on September 27, 2010, and in January 2011, without a break in service, the University selected Ms. Frett to fill the permanent Senior Administrative Personnel position of Senior Director and Chief Talent Officer in the Office of Human Resources.

10.     Ms. Frett was employed continuously at Howard University between September 27, 2010 and April 2, 2012.  During her tenure at Howard University, Ms. Frett was involuntarily placed on administrative leave on December 15, 2011 pending the internal resolution of her internal EEO complaint, which was filed against Defendant-Howard University and Defendant-Jones.  This internal complaint preceded the filing of her first formal charge with the EEOC on March 27, 2012.

11.     On March 28, 2012, President Sidney A. Ribeau notified Ms. Frett that the internal EEO investigation into her claims did not yield sufficient facts to support the allegations.  Furthermore, on March 29, 2012, Antwan Lofton, Director of Equal Employment Opportunity & Diversity at Howard University and Hospital, e-mailed Ms. Frett to inform her that she could return to work from her administrative leave on April 2, 2012, due to the University's finding of no cause regarding her EEO complaint.

12.     On April 2, 2012, Ms. Frett returned to work at Howard University and immediately was summoned by Defendant Jimmy Jones to his office and fired from her position following the University's finding of no cause regarding her EEO complaint.

## II.     Defendants

### Howard University

13.     Howard University, Defendant, is a private academic institution of higher learning that maintains its principal offices in Washington, District of Columbia.

14.     Defendant-Howard University is one of two federally chartered, non-military higher education institutions.  The only other federally chartered, non-military higher education institution in the United States is Gallaudet University, a higher education institution for students who are deaf or otherwise hearing impaired.

15.     Defendant-Howard University is a federally charted university, which receives substantial federal appropriations each year pursuant to 20 U.S.C. §§ 121-130aa.

16.     In 2011, for example, the federal government appropriated $234,977,000 to Howard University.   In 2012, Howard University received federal appropriations of $234,507,000, and for 2013, the United States Department of Education requested federal appropriations of $234,064,000 for Howard University.

17.     According to Howard University's Office of the President, Howard University's mission statement is to operate and serve as a comprehensive, research-oriented, historically black private University providing exceptional experience of exceptional quality to students of high academic potential with particular emphasis upon the provision of educational opportunities to promising black students.

### Dr. Sidney A. Ribeau, President of Howard University and Chief Executive Officer of Howard University

18.     Dr. Sidney A. Ribeau, Defendant, is the current President and Chief Executive Officer of Howard University.

19.     Dr. Sidney A. Ribeau, Defendant, has been the President and Chief Executive Officer of Howard University since August 2008, which includes the time period in which the discrimination and retaliation against Ms. Frett transpired.

20.      Although he reports to the Board of Trustees, President and CEO of Howard University, Dr. Sidney A. Ribeau, is directly responsible for the day-to-day actions and practices that transpire at Howard University.

21.     As a Cabinet member, Executive Vice President, and Chief Human Resources Officer, Defendant-Jones reported directly to and served as an advisor and trusted confidant to President Dr. Sidney A. Ribeau.

**The Board of Trustees of Howard University**

22.     The Board of Trustees of Howard University, Defendant, is entrusted with the governance of Howard University.  Pursuant to the By-laws of the Board of Trustees, the Board shall be responsible for controlling and directing the affairs, property, and interests of the University and may exercise all powers and authorities conferred upon the University by its Act of Incorporation (also known as, the University's Charter) and as otherwise permitted by law.

23.     Pursuant to the Howard University Code of Ethics and Conduct adopted by the Board of Trustees, the Board of Trustees, Defendant, committed itself to providing the opportunity to the University's Administrative Staff to serve the institution to their fullest potential and in a work environment that is safe and free from illegal discrimination.

24.     Former Virginia Governor L. Douglas Wilder, Defendant, was a member of the Howard University Board of Trustees at the time of the discrimination and retaliation against Ms. Frett.

**Honorable L. Douglas Wilder, Former Chairman of the Audit and Legal Committee of the Board of Trustees of Howard University**

25.     Honorable L. Douglas Wilder, Defendant, was the Chairman of the Audit and Legal Committee of the Board of Trustees of Howard University at the time of the discrimination and retaliation against Ms. Frett.

26.     Governor Wilder was Chairman of the Audit and Legal Committee, which is the committee that is responsible for advising the full Board of Trustees as to how to implement the Code of Ethics and Conduct.

27.     After Ms. Frett filed a complaint of discrimination, hostile work environment, retaliation, and waste, fraud, and abuse with the Legal and Audit Committee of the Board of Trustees on April 10, 2012, Governor Wilder, Chairman of the Legal and Audit Committee, responded directly to Ms. Frett via e-mail stating that he was looking into Ms. Frett's claims and accepted responsibility for following up with her inquiry.

28.     To this day, Defendant-Governor Wilder has not followed up with Ms. Frett to address or attempt to resolve the claims of discrimination, hostile work environment, retaliation, and waste, fraud, and abuse that she discussed in detail in the complaint she filed with the Board of Trustees and the Audit and Legal Committee within the Board of Trustees.

### James "Jimmy" Jones, Former Executive Vice President, Chief Human Resources Officer, and Cabinet Member of Howard University

29.     As the self-described leaders of Howard University's valued workforce, the Office of Human Resources serves the entire University community.

30.      Per their Mission Statement, the Office of Human Resources attracts, recruits, inspires, and retains a superior workforce dedicated to performance, excellence, mutual respect, diversity, and the overall well-being of every member of the University Community.

31.     The Office of Human Resources is led by the Executive Vice President and Chief Human Resources Officer, a member of the Cabinet of Howard University.

32.     James "Jimmy" Jones, Defendant, was the Executive President and Chief Human Resources Officer and a Cabinet member of Howard University at the time of the discrimination and retaliation against Ms. Frett.

33.     As a member of the Cabinet and in accordance with his employment agreement with Howard University, Defendant-Jones reported directly to the President of the University, Dr. Sidney A. Ribeau.

34.     Furthermore, per his employment agreement, Defendant-Jones served as a partner and trusted advisor to the President and Cabinet.

35.     The University's website asserts that the Executive Vice President and Chief Human Resources Officer is specifically entrusted with governing and approving the University's efforts to create "a fair and equitable environment that fosters personal and professional development."

36.     The aforementioned EEO complaints that Ms. Frett filed (both the original and the supplemental complaints) addressed overtly discriminatory and retaliatory acts, behavior, and employment practices of Defendant-Howard University and Defendant-Jones.

37.     At least five female employees of Howard University, including Plaintiff-Frett, have filed EEOC charges against Defendant-Howard University and Defendant-Jones for creating a hostile work environment, overt discriminatory treatment in the workplace, and/or retaliation resulting from the filing of individual internal EEO complaints and/or EEOC charges.

38.     Additionally, during his tenure at Howard University, Defendant-Jones was also a principal of a private company, PRM Consulting Group, which purports to provide "HR services."

39.     During his tenure at the University, Defendant-Jones served as a senior manager at PRM Consulting Group in the role of Principal and Managing Partner at the same time as he was Executive Vice President and Chief Human Resources Officer at Howard University.

40.     Defendant-Jones's wife and brother were employees of PRM Consulting Group at the time Defendant-Jones was employed as Executive Vice President and Chief Human Resources Officer of Howard University.  In addition, Defendant Jones hired his friends and

associates from PRM Consulting group as contractors and employees to perform contractual duties for Howard University

41.     During his tenure at Howard University, despite his professional and personal relationship with PRM Consulting Group, Defendant-Jones managed a $500,000 no-bid contract between Howard University and PRM Consulting Group.

42.     During his tenure at Howard University, Defendant-Jones also diverted business to PRM Consulting Group that could have been performed more cost effectively by current Human Resources staff at Howard University.

43.     During his tenure at Howard University, Defendant-Jones hired a number of PRM Consulting Group employees to work in positions at Howard University, including Director level positions.

44.     During his tenure at Howard University, Defendant-Jones also had a financial interest and relationship with Robinson Consulting Group (affiliated with PRM Consulting Group)—a business entity to which Defendant-Jones awarded a no-bid executive recruitment contract/purchase order.

45.     Following Ms. Frett's termination on April 2, 2012, Defendant-Jones was released from his employment contract with Howard University in November 2012. On information and belief, Defendant-Jones was terminated for cause, having acted in a manner violative of his employment agreement with Howard University.

46.     Defendant-Jones's employment agreement with Howard University provided that the University would not be required to pay severance to Defendant-Jones if he was terminated for cause.  The employment agreement clarifies that, upon termination for cause, with limited

exceptions, Defendant-Jones's rights to base salary, benefits, and all other entitlements under the employment agreement shall terminate on the effective date of such termination.

47.     According to Defendant-Jones's employee agreement, "cause" includes a breach of the Agreement that is materially detrimental to the University, material harmful neglect or negligence in performing his duties, dishonesty or breach of fiduciary duty or other serious misconduct, or violation of the rules, regulations, policies or standards of the University or applicable law.

## FACTS

### I. Plaintiff-Ms. Frett's Professional Background and Employment at Howard University

48.     Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

49.     Throughout her adult life, Plaintiff Jeannette Frett has consistently excelled in her endeavors both academically and professionally.  In 1991, Ms. Frett earned her Masters in Business Administration (MBA) from the University of Maryland.  Ms. Frett also received a Senior Professional Human Resources (SPHR) certification from the Society for Human Resources Management.

50.     Directly prior to her employment at Howard University, Ms. Frett worked in the human resources industry for twenty-five years.  Ms. Frett was extremely successful in previous roles as a Senior Vice President for Human Resources at Banco Popular, Vice President of Recruiting for Fannie Mae, Director of Human Resources and Recruitment for Verizon, Assistant Dean for Georgetown University, and an international recruiter for Development Alternatives, Inc., University of Maryland, and CARE USA.

51.     Ms. Frett began working for Defendant-Howard University on September 27, 2010 as a consultant responsible for conducting assessments of and making recommendations to the employment/recruitment unit and immigration/visa unit within Howard University.  At this time Ms. Frett was also responsible for providing Human Resources Business Partner support to designated departments throughout the University.

52.     In January 2011, after successfully completing the assessments and providing appropriate recommendations to the specified units, Ms. Frett was offered the position of Chief Talent Officer and Human Resources Business Partner at Howard University.

53.     Defendant-Jones and Ms. Frett established in their original agreement that Ms. Frett's total compensation for her full-time position would be in the amount of $200,000, including, but not limited to, a base salary of $150,000, a bonus of 10% of her base salary for general performance, and another bonus of 20% of her base salary for executive recruitment.

54.      As Human Resources Business Partner, Ms. Frett supported the largest faculty, student, and staff population block at Howard University (specifically nine Deans, the Office of the Provost, AA Research, the Library, Enrollment Management, the Bunche Center, the International Unit for AA, Recruitment for the University and Hospital, and Immigration/Visa Services).  Ms. Frett also supported the majority of staff who were eligible for the Phased Retirement Program, and Ms. Frett operated four separate sites.

55.     Beginning in January 2011 and continuing through Ms. Frett's termination on April 2, 2012, Ms. Frett reported directly to Defendant-Jones, Executive Vice President and Chief Human Resources Officer of Howard University.

56.     Throughout her tenure at Howard University, Ms. Frett has been an excellent performer, as documented by a Performance Evaluation Process (PEP) conducted by the

13

University in July 2011.  Ms. Frett received the highest ratings of the Senior Directors in the Office of Human Resources.

## II. Hostile Work Environment

57.     Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

58.     Defendant-Jones, Executive Vice President and Chief Human Resources Officer of Howard University, continually engaged in behavior that created a hostile work environment, including, but not limited to, the use of highly offensive racist epithets at a formal cabinet meeting and a formal Human Resources Leadership Team meeting, the use of inappropriate sexual jokes in the workplace, and the questioning of African American female employees about whether they had "ever worked for a black man before."

59.     Because Ms. Frett worked in the Office of Human Resources with Defendant-Jones and reported directly to him, Ms. Frett was routinely subjected to the hostile work environment created by Defendant-Jones's racist epithets, sexual jokes, and overtly sexist comments.

60.     Because of Defendant-Jones's discriminatory and hostile behavior, Ms. Frett and at least four other female employees of Howard University have filed formal complaints with the United States Equal Opportunity Commission against Defendant-Jones.

### Defendant-Jones Used Racist Epithets at a Formal Cabinet Meeting and a Formal Human Resources Leadership Team Meeting

61.     On several occasions, at both formal Cabinet meetings and Human Resources Leadership Team meetings, Defendant-Jones, Executive Vice President and Chief Human Resources Officer of Howard University, used the term "HNIC" (i.e., an acronym he used for the

14

term "Head Nigger in Charge") to refer to himself and to other Howard University employees who were in charge of University programs.

62.   In early 2011, at a Cabinet meeting, Defendant-Jones discussed which African American University employees were the "H.N.I.C."

63.   Defendant-Jones discussed which African American employees were the "H.N.I.C." in the presence of several African American male Cabinet members as well as white male Cabinet members (specifically, Donald Bell and Bob Tarola).

64.   When Defendant-Jones later realized that the white Cabinet officers did not know the meaning of "H.N.I.C.," Defendant-Jones contacted the white Cabinet officers to clarify that "H.N.I.C." meant "Head Nigger in Charge."

65.   At some time between March and June 2011, during a Human Resources Leadership Team ("HRLT") meeting, where Plaintiff was present due to her position as Senior Director and Chief Talent Officer in the Office of Human Resources, Defendant-Jones recounted the discussion among himself and other Cabinet members about who was the "Head Nigger in Charge."

66.   Historically, people who have referred to themselves as the "Head Nigger in Charge" have not taken kindly to anyone who they believe is challenging their authority, especially if it is a woman.  Defendant-Jones's continued and frequent reference to himself as "H.N.I.C." was used to emphasize his authority and discourage any challenge to his actions and directives.

67.   By recounting this discussion about the "Head Nigger in Charge" to Ms. Frett directly and the other members of the Human Resources Leadership Team, Defendant-Jones was sending a message to Ms. Frett and the others that they should not question his authority, which was

threatening especially to Ms. Frett in light of Defendant-Jones's other discriminatory and harassing behavior towards Ms. Frett, as set forth in more detail below.

68.    Furthermore, because of his responsibility to "govern and approve" the efforts of the University staff and faculty as the Executive Vice President and Chief Human Resources Officer, Defendant-Jones's repeated use of the racially-charged epithet "Head Nigger in Charge" was crude, shocking, and highly offensive to Ms. Frett.

69.    Defendant-Jones's repeated use of the racially-charged term "Head Nigger in Charge" at formal Cabinet and Human Resources Leadership Team meetings was subjectively and objectively offensive, especially in light of the fact that Defendant-Jones, as the Executive Vice President and Chief Human Resources Officer, was individually entrusted with governing and approving the University's efforts to create "a fair and equitable environment that fosters personal and professional development."

**Defendant-Jones Made Sexual Jokes during a Formal Human Resources Leadership Meeting and Condoned the Sexist Behavior of Colleagues**

70.    On November 16, 2010, at a Human Resources Leadership Team meeting led by Defendant-Jones, Defendant-Jones unapologetically uttered sexually-charged jokes in the presence of female and male Senior Directors of the Office of Human Resources and a male Cabinet member.

71.    Defendant-Jones and a Senior Director openly and casually discussed Defendant-Jones's perceived sexual prowess on University premises at a formal business meeting with ten to twelve employees present, including Ms. Frett.

72.    Defendant-Jones's open and casual discussion of a sexually-charged joke was highly offensive to Ms. Frett and to other females in the room.

73.     Furthermore, Ms. Frett approached Defendant-Jones, her supervisor and Chief Human Resources Officer, on several occasions to discuss and remedy how Anthony Jacks, Director of Human Resources, spoke to Ms. Frett in a demeaning, disrespectful, and sexist manner.

74.     Ms. Frett communicated to Defendant-Jones that numerous members of the Howard University Hospital also expressed concern about the sexist, condescending behavior of Mr. Jacks, Director of Human Resources.

75.     Despite Ms. Frett's several attempts to discuss the other sexist behavior in the Office of Human Resources at Howard University, Defendant-Jones refused to intervene, dismissing Ms. Frett's complaints as a "personal matter" for Ms. Frett to resolve.

76.     Despite Ms. Frett's complaints about Mr. Jack's sexist and demeaning behavior towards female employees, Mr. Jacks was soon after promoted to the new responsibility of Employee Relations, sending a message to Ms. Frett that her workplace complaints would not be addressed.

77.     Through Defendant-Jones's open use of sexually-charged jokes in the workplace and his dismissal of complaints about the sexist behavior of his colleagues, Defendant-Jones contributed to a hostile work environment that was objectively and subjectively abusive.

**Defendant-Jones Questioned Two Female Employees about Whether They Had Worked for a Black Man Before and Often Told Ms. Frett He Likes to Wrestle**

78.     In the Office of Human Resources, Defendant-Jones often acted as if his past employment in predominately white environments made him feel superior to other African American people, especially dark-skinned, African American females, including Ms. Frett.

79.     During the week of June 13, 2011, Ms. Frett was walking down the hall with Dr. Valeria Stokes, who is also African American, when Defendant-Jones walked up behind them,

towering over their heads, and provocatively asked them, "Have you ever worked for a black man before?"

80.     Both Ms. Stokes and Ms. Frett were stunned to have been asked this question while at work by the Executive Vice President and Chief Human Resources Officer, especially in light of the fact that Defendant-Jones had discriminated against them earlier that week, as set forth below.

81. Additionally, Defendant-Jones often told Ms. Frett that he likes to "wrestle."  When he first used the term, Ms. Frett did not understand what he meant.  He later clarified his meaning, noting that by "wrestling," he meant having violently aggressive, public discussions with Ms. Frett.

82.     Ms. Frett told Defendant-Jones on several occasions that she did not like to have such hostile conversations with him, but he continued to do so, despite her explanation to him that it made her uncomfortable and that she felt threatened.

83.     Defendant-Jones also communicated that he likes to wrestle to another woman, Carolyn Steptoe, his Executive Assistant.  On November 2, 2011, Defendant-Jones shouted at Ms. Steptoe that he "likes to be right, that he is in the smartest in the room, and that he likes to wrestle."

84.     Defendant-Jones's use of racially-charged epithets, sexually-charged jokes, and sexist, demeaning comments towards female employees created a hostile work environment that was objectively and subjectively offensive and abusive.

85.     Because of these actions and other actions similar to these, Ms. Frett and at least four other female Howard University employees have filed EEOC charges against Defendant-Jones.

### III. Skin-color-based Discrimination Against Ms. Frett

86.     Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

87.     Defendant Jones engaged in colorism, a form of discrimination that involves favoring lighter skinned African Americans over darker skinned African Americans.  Ms. Frett is a dark-skinned African American woman, and Defendant-Jones treated Ms. Frett differently because she is a dark-skinned, African American female.

88.     Defendant-Jones established a core Human Resources team of seven employees with whom Defendant-Jones consulted and collaborated on strategic and operational issues.

89.     The core Human Resources Leadership Team was comprised of five Human Resources Partners, the Executive Assistant for the Chief Human Resources Officer, and Defendant-Jones. The team included: Defendant-Jones, Chief Human Resources Officer and Executive Vice President (African American male); Michael McFadden, Chief Compensation and Benefits Officer and Senior Human Resources Director (white male); Anthony Jacks, Human Resources Director (African American male); Dr. Valeria Stokes, Chief Learning Officer and Senior Human Resources Director (light-skinned, African American female); Kym Wilson, Human Resources Director (light-skinned, African American female); Carolyn Steptoe, Executive Assistant to Defendant-Jones (light-skinned, African American female); and Plaintiff-Jeannette Frett, Chief Talent Officer and Senior Human Resources Director (dark-skinned, African American female).

90.     As the only dark-skinned, African American female in the core Human Resources team, Ms. Frett has experienced disparate treatment from Defendant-Jones based on her skin color, as well as her gender.

91.     On several occasions, Defendant-Jones personally shared with Ms. Frett that he was accustomed to being one of the few African Americans in his circle of executive leadership at his previous places of employment.

92.     Defendant-Jones often stated that this was his first time working in an African American environment and that it was "different" from what he was accustomed to.

93.     Defendant-Jones established an order of preferential treatment, whereby Defendant-Jones repeatedly distributed resources and support based upon his own discriminatory hierarchy:  first to the white males, then to the African American males, then to the light-skinned, African American females, then to dark-skinned, African American females, including Ms. Frett.

94.     Ms. Frett was hired in September 2010 to conduct an assessment of the Employment/Recruitment Department in order to address critical deficiencies and mitigate potentially costly risks that existed in the Office of Human Resources and the Employment/Recruitment Department.

95.     Defendant-Jones hired Ms. Frett at a time when the University needed recruitment expertise to assess and remedy the critical deficiencies within the Employment/Recruitment Department, which was performing poorly.

96.     The Director of the Employment Unit at the time was Ms. Kym Wilson (light-skinned, African American female).  Ms. Kym Wilson had no employment law experience, knowledge, or skill, despite serving as the leader for the Employment Unit of the Employment/Recruitment Department.

97.     Upon meeting with every member of the Employment/Recruitment Department and assessing the Employment/Recruitment Department, the findings revealed to Ms. Frett that

the service was unsatisfactory and changes were necessary to rectify and remedy the deficiencies, including replacing Ms. Kym Wilson with qualified leadership.

98.     Defendant-Jones emphatically dismissed Ms. Frett's findings and recommendations to replace Ms. Wilson (light-skinned, African American female) with a qualified Director of Employment.

99.     Instead, Defendant-Jones directed Ms. Frett to train Ms. Wilson to become the Director of the Recruitment Unit, as Ms. Wilson would soon be promoted to the leader of the entire Employment/Recruitment Department.

100.    Defendant-Jones ignored the assessment as well as the advice that he hired Ms. Frett (dark-skinned, African American female) to conduct and provide, and, instead, Defendant-Jones promoted the unqualified Ms. Wilson (light-skinned, African American female) to the position of Director of Recruitment, in addition to her current position of Director of Employment, ignoring Ms. Wilson's total lack of experience, knowledge, or qualifications for the position.

101.    During this time, despite Ms. Frett's expressed concerns regarding Ms. Wilson's inadequate performance and the adverse impact on the Department and University, Defendant-Jones increased Ms. Wilson's salary by approximately $15,000.  Thus, Ms. Wilson's promotion to her new role included a 20% pay increase.

102.    Ms. Frett was charged with overseeing and training Ms. Wilson.  In February or early March 2011, based on Ms. Wilson's poor performance, Ms. Frett once again recommended that Defendant-Jones replace Ms. Wilson with a qualified Director of Employment and Recruitment.

103.    Defendant-Jones continued to dismiss Ms. Frett's recommendations, stating that Ms. Frett's opinion was "personal and petty."

104.    A few weeks later, in March 2011, Troy Stovall, Chief Operating Officer, made the same recommendation to Defendant-Jones to replace Ms. Wilson with a qualified professional.

105.    The next day Defendant-Jones announced that he was moving Ms. Wilson to a new role that he would create for her.  Ms. Wilson was soon moved to the newly created position of Human Resources Director—a position which Defendant-Jones created especially for Ms. Wilson and which Defendant-Jones did not interview or consider other qualified Human Resources employees to fill.

106.    After announcing Ms. Wilson would be moved to a new position based on Mr. Stovall's recommendation, Defendant-Jones publicly rebuked and humiliated Ms. Frett in front of several colleagues for not supporting his desire to keep Ms. Wilson in her Director of Employment/Recruitment position during the conversation with Mr. Stovall the previous day. Defendant-Jones insisted again that Ms. Frett's professional opinions regarding Ms. Wilson's qualifications and performance were "professional and petty."

107.    Even though Mr. Stovall and Ms. Frett reached similar conclusions about the need to change the staff in the Employment/Recruitment Department, Mr. Jones publicly lashed out at only Ms. Frett, the female, and not at Mr. Stovall, the male.

108.    Instead of acknowledging the incompetence of the Director of Employment/Recruitment, Ms. Wilson (light-skinned, African American female), Defendant-Jones forced Ms. Frett (dark-skinned, African American female) to train Ms. Wilson for a promotion that she had already been awarded and then attacked Ms. Frett's judgment,

professional opinion, and character, when a male University employee expressly confirmed her findings.  This was not merely a breach of standards of professional behavior, rather, it was demonstrative of Defendant-Jones's preferential treatment of light-skinned employees and discrimination against dark-skinned, African American female employees.

109.   Ms. Frett's findings regarding Ms. Wilson's incompetence were also later substantiated by the I-9 audit findings that were conducted between May and August 2011, which uncovered a potential $9 million University liability due to the gross negligence under the leadership and direction of Ms. Wilson.

110.   Furthermore, Defendant-Jones mistreated and routinely made disparaging remarks about other dark-skinned female employees.

111.   Defendant-Jones's disparaging comments about other dark-skinned women were not based on their performance, but rather on Defendant-Jones's assertion that they lacked intelligence and proper communication skills.  Defendant-Jones did not criticize the intelligence or communication skills of other employees who were light-skinned, African American females or males.

112.   Additionally, in June 2011, Mr. Jones refused to support Ms. Frett's efforts to enter a Ph.D. program in 2011, even though he had supported the advanced education of Ms. Wilson (light-skinned, African American female).

**IV. Gender-based Discrimination Against Ms. Frett**

113.   Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

**Defendant-Jones Publicly Attacked Ms. Frett's Professional Judgment but Did Not Criticize a Similarly-situated Male Colleague**

23

114.    As set forth above, Defendant-Jones ignored and criticized Ms. Frett's professional judgment regarding Ms. Wilson's unsatisfactory performance as Director of Employment/Recruitment.

115.    Defendant-Jones respected and implemented the recommendation to replace Ms. Wilson with a qualified Director but only when the recommendation was made by a male employee, Troy Stovall, a few months after Ms. Frett first recommended the course of action and within a month of Ms. Frett recommending the course of action again.

116.    Despite respecting Mr. Stovall's professional judgment and implementing his recommendation, Defendant-Jones publicly, in the presence of University colleagues, criticized Ms. Frett's identical professional assessment, calling it "personal and petty."

117.    Defendant-Jones did not criticize Mr. Stovall's or any other male employee's professional assessment and recommendation as being "personal and petty."   However, Defendant-Jones flagrantly announced that he believed Ms. Frett's assessment and recommendation, even though it was the same as a male colleague's, was "personal and petty."

118.    Additionally, during the week of June 13, 2011, during a business discussion, Defendant-Jones suddenly stood up and raised his voice loudly and shouted at Dr. Valeria Stokes and Ms. Frett (but not at the male also involved in the discussion, Kirk Dixon).  Defendant-Jones emphasized, in directing his remarks to the women present, that he was the head of Human Resources so he will make the decisions and do whatever he wanted.  Suggestions from women were not just unwelcome; they were publicly rejected by Defendant-Jones.

119.    Although Kirk Dixon (white male) was also present during the business discussion the four were involved in, Defendant-Jones directed his anger only to the two black

females, Ms. Stokes and Ms. Frett. The roar of Defendant-Jones was frightening, harassing, and highly offensive to Ms. Frett and Ms. Stokes.

120. As set forth above, on that same day during the week of June 13, 2011, Defendant-Jones crept up behind Ms. Frett and Ms. Stokes while they were walking down the hall and provocatively asked them, as he towered over their heads, "Have you ever worked for a black man before?" Defendant-Jones did not ask the same threatening question to the male colleague, Kirk Dixon (white male), who had also attended the meeting. He singled out women for this remark, clearly implying that they should recognize their place as subordinate to Defendant-Jones.

### Defendant-Jones Criticized the Performance and Communication Skills of Only Female Cabinet Members

121. On several occasions between February and September 2011, Defendant-Jones was overheard making disparaging, disrespectful, and unprofessional comments about female Cabinet officers, including Dr. Eve Higginbotham (female), Dr. Judi Latta (female), Dr. Barbara Griffin (female), and Norma Leftwich, former General Counsel of Howard University (female).

122. Defendant-Jones found it difficult to work with women, particularly women with any authority. On more than one occasion, Defendant-Jones told Ms. Frett that Dr. Griffin and Dr. Latta (females) did not belong at the Cabinet level (Defendant-Jones's level) because of their "poor communication skills," a reference he only made about women. Defendant-Jones insisted that these women lacked the executive presence of a Cabinet officer and made the Cabinet look bad.

123. On another occasion, Defendant-Jones stated that Dr. Higginbotham and Dr. Griffin exhibited poor performance and should be removed from their executive roles. He did not publicly make similar observations or comments about male Cabinet members.

25

124.   When Ms. Frett recommended, as a remedy, that these female executives be assigned executive coaches, instead of replacing them, Defendant-Jones ignored the recommendation and continued to criticize the female executives, even though executive coaches had already been authorized for at least two other senior male employees at the University.

125.   Defendant-Jones did not criticize male Cabinet officers as not belonging at the Cabinet level or for making the Cabinet look bad, despite other employees' discussions of performance issues involving male Cabinet officers.  His unwarranted and unrelenting criticism of women in the workplace created and contributed to a hostile work environment.

**Defendant-Jones Discriminated Against Ms. Frett by Restructuring a Budget Program to Require Her to Seek Defendant-Jones's Permission Before Receiving Funds**

126.   In 2011, Defendant-Jones requested that each Human Resources Director submit a 2012 budget that included projected training costs.

127.   After Ms. Frett's budget was approved and Defendant-Jones realized that Ms. Frett was one of the few Directors who included training dollars for the development of her team, Defendant-Jones intervened to consolidate all the training dollars under his budget and create a process that would require Directors to seek permission for the dollars instead of allocating the funds to the Directors and allowing them to manage the funds.

128.   Defendant-Jones made this structural change to undermine, harass, and retaliate against Ms. Frett in front of her colleagues.

**Defendant-Jones Discriminated Against Ms. Frett with Respect to Compensation**

129.   From January 2011, when Ms. Frett was promoted to the full-time position of Chief Talent Officer and Human Resources Business Partner at Howard University, until Ms.

26

Frett was fired on April 2, 2012, Defendant-Jones did not honor the terms of their original agreement for total compensation in the amount of $200,000 per year.

130.    Despite their agreement of a total compensation package of $200,000 per year (including performance-based bonuses), Defendant-Jones compensated Ms. Frett at a salary rate of $150,000 per year with no bonuses.

131.    In September 2011, Defendant-Jones adjusted Ms. Frett's base salary to $159,000. Ms. Frett received the same adjustment as the other two Senior Directors in Ms. Frett's classification (namely, Dr. Valeria Stokes and Michael McFadden), despite the fact that Ms. Frett had the highest performance rating and Mr. McFadden, a white male, had the lowest rating.

132.    On several occasions, Ms. Frett asked Defendant-Jones to adjust her salary and to pay out the performance bonuses they had agreed upon when she assumed her full-time position at the University.

133.    Defendant-Jones refused to grant Ms. Frett the bonuses they had agreed upon because of unlawful discrimination.  The unsubstantiated explanation that he offered to Ms. Frett, however, was that he was unable to authorize bonuses not previously approved by the Board of Trustees.   In fact, Defendant-Jones paid and/or authorized bonuses for similarly situated male staff and light-skinned African Americans, including Ms. Kym Wilson, that were not previously authorized by the Board, but not for Ms. Frett, who was promised to receive performance-based bonuses in her total compensation package.   For example, Michael McFadden (a Senior Director of Human Resources in the same classification as Ms. Frett) was awarded a higher salary increase than Ms. Frett despite his inferior performance appraisal.

134.    Howard University and Defendant-Jones failed to pay Ms. Frett equivalently to male employees with similar scope and responsibility.  As the Chief Talent Officer, Ms. Frett

had personal access to and knowledge of salaries of male employees who were similarly situated. As opposed to Ms. Frett, Michael McFadden (a Senior Director of Human Resources in the same classification as Ms. Frett) was awarded a bonus and/or substantial pay increase, but Ms. Frett was not awarded any bonus despite her higher performance reviews and ratings; Mr. Omowale Crenshaw, the Managing Director of Capital Asset Development, earned an annual salary of $180,000 with a $30,000 bonus; Mr. Andrew Powell, Chief Financial Officer of Academic Affairs, and Daryl Jackson, Chief Financial Officer of Health Sciences, were both paid $230,000. Additionally, Defendant-Jones increased the salaries of two males: Mr. Anthony Jacks and Mr. Tyrone Pitts, whose salaries increased despite concerns about their poor performance issues. Furthermore, around July 2011, Defendant-Jones hired Kirk Dixon (white male) to be the Project Director for special/transition projects.  Defendant-Jones provided the new male employee, Mr. Dixon, with resources, compensation, and support above and beyond what had been available to others, including to Ms. Frett, a female executive who had requested and been denied the compensation she had been promised in July 2011 but was thereafter denied, despite her superior performance reviews when compared to similarly situated male employees.

135.    The award of bonuses and adjustments to salary bases was described as a merit-based system, and Defendant-Howard University and Defendant-Jones overrode these requirements in order to discriminate against Ms. Frett, ignoring her superior performance qualifications, and awarded bonuses to similarly situated men whose performance reviews were inferior to Ms. Frett's.

136.    According to Ms. Frett's employment agreement with the University, if she was terminated within one year of employment, Ms. Frett was entitled to six months of severance pay.  Upon termination, Ms. Frett was not offered any severance pay and, after inquiring with

Defendant-Jones about this discrepancy, Ms. Frett was told she would not receive the severance pay, to which she clearly was eligible under the terms of her agreement.

137.    Howard University and Defendant-Jones discriminated against Ms. Frett by not paying her equivalently to male employees with similar scope and responsibility, by denying Ms. Frett the performance-based bonuses she was promised from the outset despite excellent performance reviews that were higher than the reviews of similarly situated males in her Department, and by awarding bonuses to similarly situated males who were comparatively inferior performers.

### Howard University and Defendant-Jones Discriminated Against Ms. Frett on the Basis of Her Gender by Firing Her and Other Women and Not Firing Similarly Situated Men with Inferior Performance Reviews

138.    As set forth below, Ms. Frett was ultimately fired under the pretext of a Reduction in Force ("RIF").  This so-called RIF was not properly conducted and it disproportionately impacted female employees, as no male employees in similarly situated positions were terminated.

139.    In addition to female employees being disproportionately affected by the so-called RIF, the University fired two female employees (namely, Ms. Frett and Ms. Steptoe) who had filed formal EEOC charges against the University and two female employees who had received better performance reviews (namely, Ms. Frett and Ms. Stokes) than the one Senior Director of the Office of Human Resources who remained employed (namely, Michael McFadden, a white male).

140.    Because terminations under the Reduction in Force are meant to be merit-based and Ms. Frett and Ms. Stokes received higher performance ratings than their male colleague, Mr. McFadden (who received the lowest performance ratings of the three Senior Directors), Ms. Frett

and Ms. Stokes were discriminated against and fired because they were women.  Howard University protected men from the effect of a RIF, disregarding the requirements established by the University for undertaking a RIF.

### V. Acts of Retaliation Against Plaintiff and Ms. Frett's Numerous Failed Attempts to Address the Hostile Work Environment and Discrimination Internally

141.    Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

#### Ms. Frett Filed an Internal Complaint on June 20, 2011

142.    On June 20, 2011, in a letter submitted to Defendant-Jones and Antwan Lofton, Director of the Office of Equal Employment Opportunity & Diversity for Howard University and Hospital, Ms. Frett outlined her concerns regarding the hostile work environment, skin color discrimination, and gender discrimination she had experienced in the previous months. Ms. Frett expressed a willingness to resolve the issues internally and informally.

#### Ms. Frett was Warned by Defendant-Jones that the Internal Complaint Would Adversely Impact Her Career

143.    Soon after filing the June 20, 2011 complaint with Defendant-Jones and Antwan Lofton, Director of EEO & Diversity, Defendant-Jones informed Ms. Frett that if she did not retract her complaint, her career progression at Howard University would be adversely impacted.

144.    Before Ms. Frett moved forward with her internal complaint, Defendant-Jones had communicated to Ms. Frett on several occasions that she was well qualified to succeed him as Chief Human Resources Officer of Howard University.

145.    After Ms. Frett filed her June 20, 2011 internal EEO complaint, Defendant-Jones stated that if Ms. Frett did not retract her complaint, she would not be considered for a future

opening of Chief Human Resources Officer because President Sidney A. Ribeau and other high-level executives would not want to work with her.

146.    Due to these conversations with Defendant-Jones, Ms. Frett feared for her professional reputation and career at Howard University.   Because of Defendant-Jones's comments about the potential adverse impact of her EEO complaint on her career, Ms. Frett expressed again a willingness to resolve the matters of discrimination and hostile work environment internally and without the formality of an EEO complaint.

**Ms. Frett Met with Defendant-Jones and Antwan Lofton on June 28, 2011 and Retracted Her Complaint Based on the "Resolutions" Discussed During the Meeting**

147.    On June 28, 2011, per suggestion of Norma Leftwich, former General Counsel of Howard University, Ms. Frett arranged to meet with Defendant-Jones and Antwan Lofton to discuss and resolve the issues outlined in her June 20, 2011 complaint.

148.    At the June 28, 2011 meeting with Defendant-Jones and Antwan Lofton, Ms. Frett, Defendant-Jones, and Antwan Lofton thoroughly discussed the issues Ms. Frett raised in her complaint.   During that meeting, Defendant-Jones and Antwan Lofton, along with the University General Counsel Ms. Leftwich, communicated to Ms. Frett that the issues would be addressed sufficiently.   As such, Ms. Frett felt at the time that the meeting was very productive, and she was assured that her issues would be resolved going forward.   Because of the seemingly productive nature of the meeting, Ms. Frett retracted her complaint, via an e-mail to Antwan Lofton, on June 28, 2011 following the meeting.

**Defendant-Jones Engaged Third Parties to Retaliate Against Ms. Frett**

149.    Despite Defendant-Jones's personal assurances that he would resolve the hostile work environment and discrimination against Ms. Frett, Defendant-Jones carried a grudge and

31

continued discriminating against Ms. Frett.  He began retaliating against her for her complaint to EEO Director Antwan Lofton.

150.    For example, in late September or early October of 2011, Ms. Frett was summoned to the office of Kym Wilson, Director of Human Resources, with the purpose of discussing the type of questions Ms. Frett asked Defendant-Jones during Human Resources Leadership Team (HRLT) meetings.  Ms. Wilson stated it had been brought to her attention that the questions Ms. Frett was asking during HRLT meetings made Defendant-Jones "look bad."

151.    Ms. Wilson stated that if Ms. Frett had any intention of becoming Defendant-Jones's successor as the Chief Human Resources Officer of Howard University, Ms. Wilson warned Ms. Frett that "it is not good to say things that make Mr. Jimmy Jones look bad."

152.    Ms. Wilson then stated that she was aware that Ms. Frett was accustomed to being the Chief Human Resources Officer and to earning a higher salary.  Ms. Frett never communicated this information to Ms. Wilson and had discussed this only with Defendant-Jones.  Ms. Frett believes that Defendant-Jones urged Ms. Wilson to have this conversation with Ms. Frett on his behalf.

153.    Furthermore, Ms. Frett had witnessed Defendant-Jones from time to time dictate scripts to Ms. Wilson prior to this meeting, wherein Ms. Wilson would thereafter communicate that scripted information to others on behalf of Defendant-Jones.  Based on these facts, Ms. Frett concluded that Ms. Wilson was speaking for Defendant-Jones when she suggested to Ms. Frett that she might be jeopardizing her job and reputation if she continued to ask Defendant-Jones tough questions.

154.    Further suggesting that Defendant-Jones urged Ms. Wilson to have this conversation with Ms. Frett on his behalf, this conversation was similar to the conversation Ms.

Frett directly had with Defendant-Jones, during which Defendant-Jones threatened that Ms. Frett's career at Howard University would be adversely impacted if she did not retract her EEO complaint (which she soon after did) because President Ribeau and other high-level executives would not want to work with her.

155.    Both of these meetings were retaliatory against Ms. Frett and threatening to Ms. Frett's personal integrity, as well as to her present and future employment at Howard University.

**Defendant-Jones Retaliated Against Ms. Frett by Restructuring Ms. Frett's Team and Areas of Responsibility Without Her Input**

156.    On November 8, 2011, Defendant-Jones held a meeting to discuss the staffing and restructuring of the Recruitment and Immigration & Visa Services Departments—departments that Ms. Frett managed—with Mr. Eric Malloy, Director of Recruitment, and Ms. Kym Wilson, Director of Human Resources.

157.    Ms. Frett later asked Defendant-Jones why he met with Mr. Malloy and Ms. Wilson to discuss an area of Ms. Frett's responsibility without her.  Defendant-Jones evasively responded by asking why Ms. Frett needed to know.

158.     Defendant-Jones was trying to change the scope of Ms. Frett's responsibilities and restructure her team without her input in retaliation for her internal EEO complaint alleging that Defendant-Jones had discriminated against her and created a hostile work environment.

**Defendant-Jones Refused to Pay Ms. Frett the Bonuses They Had Agreed Upon and Intentionally Violated Her Privacy By E-mailing Her Private Compensation Information to Other Employees**

159.    As set forth above, on several occasions, including in September 2011, Defendant-Jones refused to pay Ms. Frett the aggregate $50,000 performance-based bonus they had agreed upon when negotiating her total compensation package.

160.    In response to the pay disparity issue that Ms. Frett and Defendant-Jones discussed on several occasions, Defendant-Jones began to copy Ms. Frett's colleagues on the e-mails addressing her compensation issues.  This was embarrassing to Ms. Frett because this was a private matter.

161.    Defendant-Jones explained that he could not authorize or award bonuses unless they had been previously approved by the Board of Trustees.  This was not a "rule" that Defendant-Jones uniformly and consistently applied and certainly was not the case when he authorized significant raises for men, an action that went unchallenged by Dr. Ribeau.

162.    Defendant-Jones authorized and awarded bonuses to male employees that were not previously approved by the Board, including a significant salary increase to Michael McFadden, a similarly situated male employee who was also a Senior Director in the Office of Human Services, like Ms. Frett, but who had received lower performance ratings than Ms. Frett.

**Ms. Frett Reinstated Her Internal Complaint in November 2011 Based on Continuing and Worsening Discrimination and Retaliation**

163.    On November 14, 2011, Ms. Frett reinstated and expanded her internal EEO complaint with Antwan Lofton, Director of EEO & Diversity, because Defendant-Jones continued to discriminate against Ms. Frett and continued to create a hostile work environment, despite the assurances Defendant-Jones had made six months prior to address the problems of discrimination and hostile work environment outlined in the June 20, 2011 complaint.  The discrimination and hostile work environment had not ceased, rather it had intensified, and Defendant-Jones, as set forth above and below, had begun also to retaliate against Ms. Frett for filing an internal EEO complaint (even though she had since retracted it based on pressure and threats from him to do so).

**Defendant-Jones Moved Ms. Frett's Belongings to a "Dirty" Office While She was on Sick-leave**

164.    On November 29, 2011, after being out of the office on sick-leave, Ms. Frett returned to her office to discover she had been moved, without notice, from the office where she had worked for over a year.

165.    Without prior notice, Ms. Frett's computer, documents, and personal belongings were relocated to a dirty office, where the drawers were filled with trash and old documents and the carpet was filthy.   Two new Human Resources consultants replaced Ms. Frett in the CHRO suite and occupied the clean office space that had formerly been her office.

166.    Ms. Frett could not access the office she was relocated to with a private key but rather could use only an HR master key to access the office.

167.    Prior to this move, all office relocations were prescheduled to allow the employee the opportunity to arrange his or her personal belongings and to ensure that the new space was clean before the employee occupied the office.

168.    When her male peers (including Michael McFadden, Eric Malloy, and Kirk Dixon) were relocated to new offices, her male colleagues were given notice of the relocation and the rooms were cleaned, freshly painted, and appropriately furnished.

169.    In Ms. Frett's case, however, she was given no notice that she would be relocated, the move was done urgently and for an unstated reason while she was out of the office on sick-leave, and the office she was relocated to was dirty and even contained the previous occupant's trash.

170.    Furthermore, Ms. Frett was informed that she would be required to wait to receive Mr. McFadden's old furniture to furnish the office where she had been relocated until Mr. McFadden received new furniture for his office at some unknown point in the future.

171.    The disparate treatment of Ms. Frett, in regards to the circumstances surrounding her office relocation, was discriminatory against Ms. Frett on the basis of her gender and was also retaliatory against Ms. Frett for reinstating her EEO complaint.

172.     Prior to this relocation, Ms. Frett had worked in the CHRO suite at a conference table for over a year.

173.    On October 4, 2011, due to her long-standing position as a Senior Director and her responsibilities therein, Ms. Frett requested private, permanent office space.

174.    On October 5, 2011, Ms. Wilson informed Ms. Frett that a private office was available on the third floor, but Defendant-Jones prohibited that move and explained that he was not interested in Ms. Frett moving out of the CHRO suite, near where his office was located.

175.    The unannounced eviction on November 29, 2011 from Ms. Frett's office—just a few weeks after Defendant-Jones insisted that Ms. Frett remain working at the conference table in his CHRO suite and only two weeks after Ms. Frett reinstated her internal EEO complaint against Defendant-Jones—was retaliation against Ms. Frett for reinstating her EEO complaint.

**Defendant-Jones Reassigned Ms. Frett's Responsibilities While She was on Sick-leave for a Few Days**

176.    On December 8, 2011, Ms. Frett informed Defendant-Jones she would take sick-leave for a few days to nurture herself back to full health because of a persisting flu/cold she suffered from.

177.    Because of the repeated instances of discrimination against Ms. Frett and Defendant-Jones's continued retaliation against Ms. Frett for attempts to resolve these matters internally, Ms. Frett did not feel comfortable informing Defendant-Jones that the emotional stress of the discrimination, hostile work environment, and retaliation by Defendant-Jones had taken its toll on her physically.

178.     As a result, Ms. Frett sought counseling to help address the mental and physical anxiety and stress caused by the intensifying discrimination, hostile work environment, and retaliation.

179.     While Ms. Frett was on sick-leave for a few days, she left an automatic out-of-office reply through her e-mail that provided information on how to contact her while she was out of the office.

180.     It had been Ms. Frett's practice to leave this out-of-office e-mail reply with her contact information when she was ill in the past, and Defendant-Jones had not communicated to her that it was an ineffective means of communication or that he objected in any way.

181.     On December 9, 2011, the day after Ms. Frett left for sick-leave, which would last for only a few days, Defendant-Jones sent an e-mail to the entire department and to several others, where he reassigned Ms. Frett's responsibilities to a man, Eric Malloy, and instructed everyone who reported to Ms. Frett to instead report to Mr. Malloy.

182.     Additionally, Defendant-Jones instructed Mr. Malloy to attend the Human Resources Business Partner meetings in place of Ms. Frett.

183.     This change in leadership and reporting duties while Ms. Frett was on sick-leave had never taken place in the past.

184.     Also, during this time, Defendant-Jones instructed Mr. Malloy to reassign Ms. Jackie Akinsika as a recruiter for the Howard University Hospital without conferring with Ms. Frett, who was the head of the unit and responsible for making such decisions.

185.     Because it was not customary to reassign an employee's responsibilities to another employee during a sick-leave that would last only a few days and because Defendant-Jones sent these e-mails to the entire Department and several executives in other departments,

these actions were clearly retaliatory to Ms. Frett.  They undermined her position, authority, responsibilities, and professional reputation at Howard University, and there was no basis for taking these actions and no precedent for proceeding in this manner.

**Defendant-Jones Urged Ms. Frett to Leave the Department**

186.    On December 9, 2011, Defendant-Jones emailed Ms. Frett urging her to take a position in another department at the University.

**Ms. Frett Filed a Formal and Updated Official EEO Complaint with Howard University on December 14, 2011**

187.    In response to the intensifying discrimination and retaliation against Ms. Frett by Defendant-Jones for reinstating her internal complaint in November 2011, Ms. Frett filed an official EEO complaint with the University on December 14, 2011.

**Howard University Forced Ms. Frett to Take Administrative Leave Over Her Objections and Other Alternative Courses of Action**

188.    In response to Ms. Frett's filing of an official EEO complaint on December 14, 2011, on December 15, 2011, despite Ms. Frett's formal requests to not be placed on administrative leave, Howard University forced Ms. Frett to take administrative leave, pending an investigation into Ms. Frett's EEO complaint regarding the discrimination, hostile work environment, and retaliation.

189.    In recent cases where male colleagues filed EEO complaints, including a case where a male colleague reported to Defendant-Jones, male employees at Howard University were not forced to take administrative leave pending resolution of their EEO complaint.  Rather, Howard University accommodated the male employees by either temporarily transferring them to different departments or changing the person to whom the male employees reported pending the investigation into their EEO complaints.

190.   Unlike administrative leave, these alternatives to administrative leave that were offered to the male employees at Howard University, but not to Ms. Frett, did not adversely impact the employees' scope of responsibility or their professional standing at the University. Defendants' placing of Ms. Frett on administrative leave, over her objections and despite feasible alternatives that had been given to male employees, constituted retaliation against Ms. Frett for her filing of an official EEO complaint.

### The Investigation into Ms. Frett's EEO Complaint was Not Conducted by an Independent Investigator and Did Not Even Include Interviews of Ms. Frett

191.   Antwan Lofton, Director of EEO & Diversity of Howard University, explained to Ms. Frett that, per EEO practice at Howard University, the investigation into the claims raised by an EEO complaint would be conducted by an independent law firm to ensure the integrity and efficacy of the investigation into the claims.

192.   Mr. Lofton also confirmed, when communicating with Ms. Frett, that the investigation would include "an interview of you, review of all relevant documents including, but not limited to, employment actions, performance reviews, and records of any past discipline; of personal interviews with co-workers, supervisors, and any other person who may have knowledge or information relevant to the allegations of the complaint."

193.   Ms. Devarieste Curry, an attorney with McLeod, Watkinson & Miller, was hired by the Office of General Counsel at Howard University to conduct the investigation into Ms. Frett's EEO claims.

194.    Ms. Curry was also charged with investigating the claims within Ms. Carolyn Steptoe's EEO complaint filed against Defendant-Jones for discrimination, hostile work environment, and retaliation.   Ms. Steptoe was Executive Assistant to Defendant-Jones at Howard University, and many of her discrimination claims mirrored and supported those of Ms.

Frett.  Ms. Steptoe's responsibilities included, among other tasks, reading Defendant-Jones's e-mails.

195.     Ms. Curry communicated to Ms. Frett that the investigation would be resolved in a prompt manner.

196.     Ms. Frett and Ms. Steptoe engaged counsel in December 2011 to represent and advise them in their proceedings with Howard University's General Counsel, Norma Leftwich, and the investigator, Ms. Curry.

197.     Despite Ms. Curry's expressed role as an "independent investigator" charged with conducting a thorough and unbiased investigation of Ms. Frett's and Ms. Steptoe's claims, Ms. Curry was anything but independent of the University.  Ms. Curry communicated to Ms. Frett's counsel and to Ms. Frett that she actually represented Howard University.  As such, given her representation of Howard University, Ms. Curry was not independent and neither was her investigation.

198.     Furthermore, the actual independence of Ms. Curry, who was hired to serve as an "independent" investigator, was further called into question in an e-mail sent on December 21, 2011 by Eric Malloy, Director of Recruitment at Howard University.

199.     In the December 21, 2011 e-mail, Mr. Malloy addressed a group of people who would likely be interviewed by Ms. Curry, stating that "the law firm [referring to Ms. Curry's law firm, McLeod, Watkinson & Miller] is actually one that represents Howard, so these would be folks on our side trying to have witnesses indicate that they were not aware of any discriminatory practices relative to whomever the complainant is."  By indicating that Ms. Curry was "on our side," Mr. Malloy intentionally signaled to all the intended bias involved in Ms. Curry's investigation.

200.   Another significant fact that bears on the determination of whether the investigation was independent and fair is that Ms. Curry never interviewed Ms. Frett or Ms. Steptoe in her investigation into their EEO claims, even though Ms. Frett and Ms. Steptoe expressed that they were available and willing to be interviewed on several occasions, intending to cooperate, fully, with the investigation.

201.    Ms. Curry refused to interview Ms. Frett and Ms. Steptoe with their counsel present.

202.   For example, on January 4, 2012, when Ms. Steptoe and her counsel appeared for the scheduled interview with Ms. Curry, Ms. Curry refused to conduct the interview with Ms. Steptoe's counsel present.  Ms. Curry provided no authority for her position refusing to conduct the interview in the presence of counsel, despite the fact that Ms. Curry had specifically identified herself as counsel representing Howard University.

203.   Ms. Frett had previously scheduled an interview with Ms. Curry for the next day, January 5, 2012.

204.   On the evening of January 4, 2012, the same day that Ms. Curry refused to interview Ms. Steptoe at their scheduled appointment because Ms. Steptoe's counsel was present, Ms. Curry abruptly cancelled Ms. Frett's interview that was scheduled for the following day, stating that Ms. Frett's counsel would not be allowed to be present in the room during the interview of Ms. Frett or even to advise her during the interview.

205.   Ms. Curry did not attempt to reschedule either interview with Ms. Frett or Ms. Steptoe.

206.   Ms. Frett and Ms. Steptoe continued to make themselves available to Ms. Curry for an interview.  Ms. Curry decided to conduct her investigation of Ms. Frett's (and Ms.

Steptoe's) claims without ever interviewing either of them.  Ms. Curry made her "findings" of no discrimination having never interviewed Ms. Frett about her assertions.

### Ms. Frett Filed a Complaint of Waste, Fraud, and Abuse with Howard University's Internal Auditor

207.    When acting within the scope of her responsibilities in the Immigration and Services Unit, Ms. Frett detected that Howard University engaged in a pattern and practice of violating federal I-9 immigration laws and ERISA requirements.

208.    Ms. Frett had reported her findings to Defendant-Jones on several occasions, including earlier in May 2011.  Defendant-Jones, however, had directed Ms. Frett to "shut down any further audit work."

209.    Pursuant to Howard University's *Hotline and Whistleblower Policy and Procedure*, "It is the responsibility of each HU and HUH employee, contractor, grantee, or recipient of University or Hospital funds to report real or suspected instances of fraud, waste, abuse, or mismanagement to the University's management, which include, but is not limited to the University's administrative officers, the Board of Trustees, or the Internal Auditor."

210.    On February 26, 2012, Ms. Frett filed a whistleblower complaint of waste, fraud, and abuse with the Internal Auditor of Howard University, Dr. Caroll Little.

211.    The information Ms. Frett reported to Internal Auditor Caroll Little demonstrated that Howard University engaged in a pattern and practice of violating federal I-9 immigration laws and ERISA requirements, about the conflicts of interest between the University and PRM Consulting Group, and about the waste, fraud, abuse, and mismanagement of University funds.

212.    Internal Auditor Caroll Little never substantively discussed these matters with Ms. Frett, despite her offers to meet with him to address the University's possible violations of federal I-9 immigration laws, which exposed the University to approximately $9 million in

liability.  Dr. Little failed to investigate these matters, explaining to Ms. Frett that he needed first to consult the General Counsel, indicating that in no way was Dr. Little acting "independently."

**Ms. Frett Filed a Formal EEOC Charge in the Washington, District of Columbia Field Office**

213.    After being placed on administrative leave on December 14, 2011, EEO staff explained to Ms. Frett that the investigation into her EEO claims would be conducted within two weeks.

214.    Furthermore, Ms. Curry communicated to Ms. Frett that the investigation would be resolved in a prompt manner.

215.    The duration of the investigation bears directly on Ms. Frett's employment at Howard University because Ms. Frett was placed on administrative leave pending resolution of the investigation into the claims within her EEO complaint.

216.    As of March 2012, nearly three months had transpired since Ms. Curry began her investigation into Ms. Frett's EEO complaint with no sign of resolution, despite assurances form Howard University EEO staff and Ms. Curry that the EEO investigation would be resolved expeditiously.

217.    As of March 2012, Ms. Frett still had not been interviewed by Ms. Curry, the investigator entrusted with the responsibility of conducting an independent and fair assessment of Ms. Frett's claims of discrimination, hostile work environment, and retaliation.  Furthermore, Ms. Frett had no reason to believe Ms. Curry would interview her based on Ms. Curry's statement that she would conduct the investigation about Ms. Frett's claims without speaking to Ms. Frett.

218.    After attempting to address her discrimination claims internally within Howard University's EEO processes and receiving no indication that a fair, independent assessment and

resolution would be forthcoming, Ms. Frett proceeded to file a formal EEOC charge with the Washington, District of Columbia Field Office on March 27, 2012.

**Howard University's Investigation Found "No Cause" for Ms. Frett's Claims, Ms. Frett Returned to her Position at the University, and Ms. Frett was Immediately Fired**

219.    On March 28, 2012, the day after Ms. Frett filed the formal EEOC charge with the Washington, DC Field Office, Ms. Frett received a letter (dated March 23, 2012) from Howard University President Sidney A. Ribeau stating that the internal EEO investigation into her claims did not yield sufficient facts to support the allegations.

220.    On March 29, 2012, Ms. Frett received an e-mail from Mr. Lofton, EEO & Diversity Director at Howard University, again stating that the investigation into her EEO claims had been closed with a finding of no cause.  Because Howard University's placing of Ms. Frett on administrative was contingent on the pending resolution of the EEO investigation and the investigation was now closed, the University no longer had that reason to compel Ms. Frett to be on administrative leave.  As such, Mr. Lofton instructed Ms. Frett via e-mail to return to work on April 2, 2012.

221.    On March 30, 2012, Mr. Lofton was informed of Ms. Frett's filing of the EEOC charge, and he was encouraged to notify Howard University's General Counsel of this fact.

222.    On Monday, April 2, 2012, just three days after Howard University learned of her filing a charge of discrimination with the EEOC, Ms. Frett returned to her office as she was instructed to do by Mr. Lofton.

223.    Later that morning, Ms. Frett was fired from Howard University.

224.    The University claimed that Ms. Frett's role as Chief Talent Officer and Human Resources Business Partner was being eliminated.

225.     Terminations under the University's Reduction in Force program were supposed to be based on evaluations of the employee's tenure at the University and evaluations of the employee's merit and performance during his or her tenure at the University.  These were not factors applied by the University when it decided to fire Ms. Frett and erroneously label it a RIF action.

226.     The Reduction in Force also resulted in the termination of Ms. Frett's colleague, Ms. Steptoe, and two other women, including Dr. Valeria Stokes.

227.      The University terminated two female employees (namely, Ms. Frett and Ms. Steptoe) with pending EEO and/or EEOC charges against a University Director, Defendant-Jones.

228.     Furthermore, both Ms. Frett and Ms. Steptoe had filed whistleblower complaints of waste, fraud, and abuse against the University.

229.     Not only did the University terminate employees who had filed complaints against the University under the pretext of a Reduction in Force, but the Reduction in Force also disproportionately impacted women, as no men in similarly situated positions were terminated.

230.      For example, in April 2012, when Ms. Frett was fired under a pretextual RIF, there were only three Senior Directors (namely, Ms. Frett, Dr. Valeria Stokes, and Mr. Michael McFadden) in the Office of Human Resources. The two African American females (namely, Ms. Frett and Dr. Valeria Stokes) were terminated under an action labeled by the University as a RIF, despite their significantly longer tenure at the University than the other Senior Director, Michael McFadden, a white male who remained employed.

231.     All of the women who were terminated under the Reduction in Force at this time had significantly longer tenure at the University than the men who remained employed.

232.    Ms. Frett also received a performance review in 2011 that ranked her as the highest performer among the three Senior Directors and as one of the top performers, if not the top performer, in the entire Office of Human Resources.

233.    More specifically, each Ms. Frett and Dr. Valeria Stokes received higher performance ratings than the male Senior Director, Michael McFadden, who remained employed, even though his female counterparts were being terminated under the so-called merit-based Reduction in Force program and had earned higher performance ratings than he. Currently, Mr. McFadden occupies the position previously held by Defendant-Jones.

234.    Defendant-Jones made all of the termination decisions, including termination of University employees who had filed EEO and EEOC charges against him for discrimination, hostile work environment, and retaliation and whistleblower complaints regarding the pattern and practices of Howard University.  President Ribeau did not intervene or in any way try to stop Defendant-Jones from his discriminatory actions; he approved them, if not overtly, at least tacitly so.

235.    Defendant-Jones's termination of Ms. Frett the day she returned from University-mandated administrative leave was retaliation for Ms. Frett's filing of a formal EEOC charge with the Washington, DC Field Office regarding Defendant-Jones's ongoing and intensifying discrimination, hostile work environment, and retaliation against Ms. Frett.

236.    Furthermore, after Ms. Frett, Ms. Stokes, and Ms. Steptoe were fired, Defendant-Jones communicated, indeed, boasted to members of the Office of Human Resources that "the three people who did not stand for my [Defendant-Jones's] success are no longer with Howard," demonstrating that the female employees were being retaliated against for filing EEO

complaints, EEOC charges, and/or waste, fraud, and abuse complaints against Defendant-Jones and Defendant-Howard University.

237.     Howard University failed to protect Ms. Frett by allowing Defendant-Jones to terminate her under a pretextual RIF despite her excellent performance reviews and significantly longer tenure than similarly situated male colleagues.   Howard University similarly failed to protect Ms. Fret from retaliation for exercising her right to file EEO complaints, an EEOC charge, and a waste, fraud, and abuse complaint against Defendant-Jones and Defendant-Howard University.

### Ms. Frett Informed the Board of Trustees of Howard University about Howard University's Retaliation Against Her for Her Report of Waste, Fraud, and Abuse

238.     On April 10, 2012 Ms. Frett submitted a letter to the Board of Trustees and to Former Governor L. Douglas Wilder, Chairman of the Audit and Legal Committee of the Board of Trustees.  That letter sought review by the Board of the unlawful activities she had sought to remedy internally.

239.   The April 10, 2012 letter reported in detail Howard University's pattern and practice of knowingly engaging in violations of immigration laws and the University's negligent refusal to address this issue, which exposed the University to significant liability.

240.   The April 10, 2012 letter also explained the opportunistic conflicts of interest inherent in Defendant-Jones's affiliation with PRM Consulting Group in violation of the University's Code of Ethics and Conduct.

241.     The April 10, 2012 letter also explained how Howard University retaliated against Ms. Frett by firing her for pursuing her discrimination claims before the EEOC and for filing a whistleblower complaint of waste, fraud, and abuse with Howard University's Internal Auditor, Carroll Little.

242.    In addition to the whistleblower protections under False Claims Act, Howard University's *Hotline and Whistleblower Policy and Procedure* states that "it is also the University's and the Hospital's policy to protect the individual from retaliation."  Howard University ignored this policy insofar as it applied to Ms. Frett.  Howard University undertook no efforts to prevent the retaliation, and it stood by, allowing the retaliation to happen.

243.    Governor Wilder contacted Ms. Frett and Ms. Frett's counsel to notify them that the Board of Trustees and the Audit and Legal Committee had received the letter regarding Ms. Frett's discrimination, hostile work environment, and retaliation claims, as well as claims regarding waste, fraud, and abuse within the University.  Besides providing notice that he received the letter, he did nothing substantively to address the issues that the letter raised.  Rather, apparently intent upon protecting the University, Governor Wilder looked to further "investigate" Ms. Frett's claims and assertions.

### Former Governor Wilder, Chairman of the Audit and Legal Committee of the Board of Trustees of Howard University, Appointed a Non-Independent Auditor to Conduct the Investigation into Ms. Frett's Claims

244.    The Board of Trustees and former Governor Wilder, Chairman of the Audit and Legal Committee, appointed Neil Keenan of PricewaterhouseCoopers, an auditor who had an existing relationship with Howard University, in July 2012 to investigate Ms. Frett's claims of hostile work environment, discrimination, retaliation, and waste, fraud, and abuse.

245.    Howard University once again—as they had done when they hired Ms. Devarieste Curry to investigate Ms. Frett's internal EEO complaints—deliberately chose to use University funds to hire an investigator who was not independent.

246.    By hiring an auditor who lacked independence to investigate Ms. Frett's claims, Howard University demonstrated that they were not committed to conducting a robust or

reliable investigation into Ms. Frett's claims of hostile work environment, discrimination, retaliation, and waste, fraud, and abuse.

247.   From the outset, Mr. Keenan explained to Ms. Frett and her counsel that PricewaterhouseCoopers was not an "independent auditor," as that term is used in the profession, because of their existing relationship with Howard University.  Mr. Keenan wanted to ensure that he was not representing himself as independent as he proceeded with his investigation into Ms. Frett's claims against Defendant-Jones and Defendant-Howard University.

248.   Neil Keenan asked Ms. Frett's counsel to produce Ms. Frett to meet with him in person so he could fully understand the claims asserted in Ms. Frett's letter.  Soon after, Mr. Keenan explained to Ms. Frett's counsel that he did not want to speak with Ms. Frett any longer. Mr. Keenan gathered information and did an investigation without meeting with Ms. Frett at this time.

### Howard University's Office of General Counsel Declined to Address Ms. Frett's Claims Despite Ms. Frett's Continuing Complaints Regarding Hostile Work Environment, Discrimination, Retaliation, and Waste, Fraud, and Abuse within the University

249.   On August 1, 2012, Kurt Schmoke, General Counsel of Howard University, communicated to Ms. Frett's counsel that his hands were tied pending the Board of Trustees' investigation into Ms. Frett's claims.  Mr. Schmoke indicated that because Governor Wilder was in the process of "investigating," he could do nothing to resolve any of the issues Ms. Frett had raised.

250.   Again on November 10, 2012, Odessa Jackson, Principal Deputy General Counsel, reaffirmed that the Board of Trustees and Governor Wilder were responsible for addressing the issues raised by Ms. Frett.

251.   Ms. Frett's counsel suggested that Mr. Keenan meet with Ms. Frett to discuss her claims, especially in light of the fact that Ms. Curry closed her internal investigation without interviewing Ms. Frett.

252.   Mr. Keenan failed to respond to Ms. Frett's counsel until Ms. Frett's counsel contacted Mr. Kurt Schmoke, General Counsel of Howard University, to inform him that Mr. Keenan did not appear to be conducting an actual or fair investigation.   Only after communicating this fact to Howard University's General Counsel did Mr. Keenan meet with Ms. Frett to discuss her claims, which he purportedly was charged with investigating by Governor Wilder and the Board of Trustees.

253.   Ms. Frett's counsel contacted Mr. Keenan to preserve all the documents that PricewaterhouseCoopers possessed or controlled that were relevant to the investigation.

254.   Mr. Keenan interviewed Ms. Frett in the presence of her counsel a few days before he claimed that he had to submit his investigative report to the Board of Trustees.

255.   To this day, the Board of Trustees and former Governor Wilder have not informed Ms. Frett of their investigative findings, if any, about her claims.

256.   Ms. Frett spent over a year attempting to resolve internally her discrimination and retaliation claims against Defendants and to remedy the issues of waste, fraud, and abuse that exposed the University to at least $9 million in liability for violations of I-9 immigration laws.

257.   Despite the severity of the waste, fraud and abuse claims against Howard University and Ms. Frett's attempts to address the claims for over a year, Defendants failed to sufficiently or substantively address these issues, to ensure thorough and independent investigations into Ms. Frett's claims, or to protect Ms. Frett from further retaliation against her by the University for her EEO and EEOC charges and her reports of waste, fraud, and abuse.

258.     By permitting these severe issues of waste, fraud, abuse, and employment discrimination and retaliation to persist within the highest levels of Howard University's administration, President Sidney A. Ribeau, the Board of Trustees, and former Governor Wilder each failed to uphold their duties as established in the University's by-laws, Code of Ethics and Conduct, Mission Statement, and Hotline and Whistleblower Policy and Procedure.

## COUNTS

### COUNT I - VIOLATIONS OF TITLE VII - GENDER-BASED and SKIN-COLOR-BASED DISCRIMINATION
**42 U.S.C. § 2000d, *et seq.*, as amended**

259.     Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

260.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 provides that:

> (a)     It shall be an unlawful employment practice for an employer
> (1)     to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2)     to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

261.     Defendants engaged in unlawful employment practices prohibited by Title VII by treating Ms. Frett differently from and less preferably than similarly situated male employees and light-skinned, African American employees and by subjecting Ms. Frett to discriminatory treatment, including, but not limited to, discriminatory disciplinary procedures, including administrative leave when male employees were temporarily transferred to different departments

51

or accommodated otherwise without being forced to take administrative leave pending investigation into their EEO complaints; disparate pay; discriminatory treatment in terms of office relocations; discriminatory harassment in front of colleagues, including calling Ms. Frett's professional judgment into question when a similarly situated male made the same judgment; discriminatory termination despite higher performance ratings than similarly situated male employees; hostile work environment; and other forms of discrimination in violation of Title VII.

262.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of the rights of Ms. Frett.

263.    As a direct and proximate result of Defendants' aforementioned conduct, Ms. Frett was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

264.    Defendants' practices and procedures have produced a disparate impact upon Ms. Frett with respect to the terms and conditions of her employment.

265.    By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout Ms. Frett's employment at Howard University, Ms. Frett is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

266.    By reason of the discrimination and hostile work environment suffered at Howard University, Ms. Frett is entitled to all legal and equitable remedies available under Title VII.

### COUNT II - VIOLATIONS OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT - GENDER-BASED AND SKIN-COLOR-BASED DISCRIMINATION
### D.C. Code § 2-1402.11

267.    Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

268.     As described above, Defendants' discrimination and eventual termination of Ms. Frett because of her gender and skin color is in violation of D.C. Code § 2-1402.11.

269.     Through their discriminatory conduct with respect to compensation, terms, and/or conditions of employment, Defendants deprived Ms. Frett of equal employment opportunities because of her gender and skin color in violation of the District of Columbia Human Rights Act.

## COUNT III - VIOLATIONS OF FEDERAL EQUAL PAY ACT
### 29 U.S.C. § 206(d)(1), *et seq.*

270.     Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

271.     Defendants unlawfully discriminated against Ms. Frett in having compensated her in an amount less than her similarly situated male colleagues.

272.     Defendants violated the Federal Equal Pay Act by subjecting Ms. Frett to unequal pay on the basis of her gender.

273.     Defendants caused, attempted to cause, or contributed to, the continuation of salary and bonus rate discrimination in direct violation of the Federal Equal Pay Act.

274.     Defendants knew of, or showed reckless disregard for, the fact that their conduct violated the Federal Equal Pay Act.

275.     As a direct result of Defendants' willful, knowing, and intentional discrimination, Ms. Frett suffered harm, including, but not limited to, lost earnings.

276.     Ms. Frett is therefore entitled to all remedies available for violations of the Federal Equal Pay Act, including liquidated damages for willful violations and attorneys' fees.

**COUNT IV - VIOLATIONS OF TITLE VII -- RETALIATION AGAINST EMPLOYEE
FOR FILING AN EEO COMPLAINT AND EEOC CHARGE
42 U.S.C. § 2000d, *et seq.*, as amended**

277.    Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

278.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer "to…discriminate against any of his employees…because [s]he has opposed […] an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

279.    By filing an internal EEO complaint with the Office of Equal Employment Opportunity & Diversity at Howard University and filing a formal charge with the United States EEOC office, Ms. Frett availed herself of protected rights under Title VII, including, but not limited to, the right to oppose and report discriminatory behavior against her by her employer.

280.     By a series of actions, including, but not limited to the following, Defendants retaliated against Ms. Frett for filing the internal EEO complaint and the formal EEOC charge against Defendants: Defendants threatened Ms. Frett that the EEO complaint would adversely impact her career, Defendants retaliated against Ms. Frett by restructuring her team and areas of responsibility without consulting her, Defendants refused to pay Ms. Frett the performance-based bonuses they had agreed upon for her total compensation package and awarded a similarly situated male with lower performance ratings a bonus of the amount promised to Ms. Frett, Defendants moved Ms. Frett to a dirty office without proper furniture while she was on-sick leave without notice, Defendants reassigned Ms. Frett's responsibilities while she was on sick-leave for a few days, which was not a customary practice,  Defendants urged Ms. Frett to leave

the Office of Human Resources despite her excellent performance reviews, Defendants placed Ms. Frett on administrative leave over her objections and feasible alternatives, Defendants assigned an investigator to Ms. Frett's case who lacked the requisite fairness and independence and who never interviewed Ms. Frett during the investigation into her claims,  and, after Ms. Frett returned from compulsory administrative leave, Defendants ultimately fired Ms. Frett, improperly claiming it was a proper RIF action, even though she received higher performance ratings than her male colleague, also a Senior Director in the Office of Human Resources, who remained employed.

281.    There is a causal connection between Ms. Frett's filing of the internal EEO complaint and the formal EEOC charge and the Defendants' retaliatory actions.   Furthermore, because of the temporal proximity between Ms. Frett's filing a formal EEOC charge on March 27, 2012 and President Ribeau's and Antwan Lofton's statements to Ms. Frett that she could return from administrative leave on March 28th and 29th of 2012 and the ultimate firing of Ms. Frett on April 2, 2012, Defendants' adverse actions against Ms. Frett occurred under circumstances that give rise to an inference of unlawful retaliation.

282.    Defendants engaged in an unlawful employment practice (i.e., retaliation) prohibited by 42 U.S.C. § 2000e-3(a), *et seq.*, by discriminating and retaliating against Ms. Frett with respect to the terms, conditions, and/or privileges of her employment because of her opposition to the unlawful employment practices of Defendants.

## COUNT V - VIOLATIONS OF WHISTLEBLOWER PROVISIONS UNDER THE FALSE CLAIMS ACT -- RELIEF FROM RETALIATORY ACTIONS
### 31 U.S.C. § 3730(h)

283.    Plaintiff-Frett re-alleges and incorporates each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

284.    By a series of actions, Defendants retaliated against Ms. Frett for reporting issues of waste, fraud, and abuse to Defendant-Jones and Dr. Caroll Little, Internal Auditor of Howard University: Defendants threatened Ms. Frett that the EEO complaint would adversely impact her career, Defendants retaliated against Ms. Frett by restructuring her team and areas of responsibility without consulting her, Defendants refused to pay Ms. Frett the performance-based bonuses they had agreed upon for her total compensation package and awarded a similarly situated male with lower performance ratings a bonus of the amount promised to Ms. Frett, Defendants moved Ms. Frett to a dirty office without proper furniture while she was on-sick leave without notice, Defendants reassigned Ms. Frett's responsibilities while she was on sick-leave for a few days, which was not a customary practice,  Defendants urged Ms. Frett to leave the Office of Human Resources despite her excellent performance reviews, Defendants placed Ms. Frett on administrative leave over her objections and feasible alternatives, Defendants assigned an investigator to Ms. Frett's case who lacked the requisite fairness and independence and who never interviewed Ms. Frett during the investigation into her claims,  and, after Ms. Frett returned from compulsory administrative leave, Defendants ultimately fired Ms. Frett, improperly claiming it was a proper RIF action, even though she received higher performance ratings than her male colleague, also a Senior Director in the Office of Human Resources, who remained employed.

285.    The whistleblower protection provisions of the False Claims Act, 31 U.S.C. § 3730(h), protects an employee from being discharged, demoted, suspended, threatened, harassed, retaliated against, or in any other manner discriminated against by the employer because of the lawful acts done by the employee in the effort to stop one or more violations of this subchapter.

286.    Defendants are liable under the whistleblower provisions of the False Claims Act, 31 U.S.C. § 3730(h), to provide Ms. Frett with all relief necessary to make her whole for their threatening, harassing, discriminatory, and retaliatory actions against Ms. Frett for her efforts to report and address the issues of waste, fraud, and abuse at Howard University.  Pursuant to the whistleblower protection provisions under the False Claims Act, a whistleblower employee is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorneys' fees, sustained as a result of the Defendants' harassment, discrimination, and retaliation against the employee for efforts protected by the whistleblower protection provisions.

## PRAYER FOR RELIEF

287.    WHEREFORE, Plaintiff-Frett requests the following relief:

(a) Declaratory judgment that Howard University's employment policies, practices, and/or procedures challenged herein are illegal and in violation of Title VII, the Federal Equal Pay Act, and the District of Columbia Human Rights Act;

(b) A permanent injunction against Howard University and its officers, directors, cabinet members, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, gender discrimination, skin-color discrimination, hostile work environment, unequal pay, and retaliation by the Defendants as set forth herein;

(c) An Order requiring Howard University to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendants' past and present unlawful employment policies, practices,

and/or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

(d) An order requiring Howard University to initiate and implement systems of assigning, training, transferring, compensating, and promoting female employees in a non-discriminatory manner;

(e) An award of back pay, front pay, lost benefits, unpaid severance, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by Plaintiff-Frett to be determined at trial;

(f) Any other appropriate equitable relief to which Plaintiff-Frett is entitled;

(g) An award of compensatory, nominal, and punitive damages to Plaintiff-Frett;

(h) An award of litigation costs and expenses, including reasonable attorneys' fees to Plaintiff-Frett;

(i) Pre-judgment interest;

(j) Post-judgment interest;

(k) Such other and further relief as the Court may deem just and proper; and

(l) Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendants have remedied the practices, policies, and/or procedures complained of herein and are determined to be in full compliance with the law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.


Dated:  April 23, 2013

       Respectfully submitted,

*Sharon Y. Eubanks*

Sharon Y. Eubanks, District of Columbia Bar No. 420147
Catharine E. Edwards, District of Columbia Bar No. 100457

**Edwards & Eubanks, LLC**
2000 P Street NW, Suite 300
Washington, DC 20036
Office Telephone: (202) 223-2732
Cellphone: (202) 505-3904
E-mail: sharon@edwarseubanks.com

***Counsel for Plaintiff***