UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JEANNETTE FRETT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 13-551 (RJL) |
| | ) | |
| **HOWARD UNIVERSITY,** | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

FEB 0 8 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
February ___, 2016 [#44]

Jeannette Frett ("plaintiff") brings this suit against Howard University ("defendant" or "Howard"), alleging employment discrimination, unlawful retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII") and the District of Columbia Human Rights Act, D.C. Code § 2-1402.11 ("DCHRA").[1] *See* Compl. [Dkt. #1]. Currently before the Court is defendant's motion for summary judgment [Dkt. #44] ("Def.'s Mot."). Upon consideration of the pleadings, relevant law, and the entire record herein, defendant's motion is GRANTED.

## BACKGROUND

Plaintiff, an African-American woman, was employed by Howard University from September 2010 until she was terminated on April 2, 2012. Def.'s Statement of Material Undisputed Facts ¶¶ 9, 164 [Dkt. #44-2] ("Def.'s SOMF"). Plaintiff has more than

---

[1] Plaintiff's complaint initially included allegations of violations of the Federal Equal Pay Act, 29 U.S.C. § 206(d)(1), but she expressly abandoned those claims in her opposition to defendant's motion for summary judgment. Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. 2 n.1 [Dkt. #50].

twenty years of experience in human resources and, although initially hired as a consultant, she transitioned into a newly created permanent position—Senior Director, Chief Talent Officer in the Office of Talent Management—in January 2011. Def.'s SOMF ¶¶ 6, 9, 18, 20. At that time, Howard also moved two other consultants, Valeria Stokes and Michael McFadden, into newly created Senior Director positions in the Office of Human Resources. Def.'s SOMF ¶¶ 16-18. All three Senior Directors reported directly to Howard's Chief Human Resources Officer and Executive Vice President, James Jones ("Jones"). Def.'s SOMF ¶¶ 17-18. Under the terms of her contract, plaintiff was paid approximately $150,000 annually and had the "opportunity" to receive a performance bonus of up to ten percent of her annual salary in her first year upon successful completion of certain objectives and a one-time performance bonus of up to twenty percent of her annual salary. Def.'s SOMF ¶¶ 25, 26, 28. Nevertheless, plaintiff contends that she was *entitled* to these bonuses per an agreement with Jones. Pl.'s Statement of Genuine Issues of Material Fact ¶ 25 [Dkt. #50-1] ("Pl.'s SOMF").

On June 20, 2011, plaintiff submitted her first internal Equal Employment Opportunity ("EEO") complaint to Jones and Antwan Lofton ("Lofton"), Howard's Director of Equal Employment Opportunity and Diversity. Def.'s SOMF ¶ 48. She described what she believed to be a "hostile and harassing work environment" due to Jones's conduct, which included criticizing her in a public email, responding in a forceful tone when plaintiff asked that she be informed about decisions that affect her area of responsibility, refusing to assign additional resources to plaintiff until she provided

2

metrics to support the request, and micro-managing her decisions. Def.'s Mot. Ex. 12 [Dkt #44-14]. Plaintiff also alleged gender discrimination based on her belief that Jones was dismissive and condescending towards her and that she should be compensated at a rate higher than her contracted salary. *Id.* After a June 28, 2011 meeting between plaintiff, Jones, and Lofton, plaintiff requested that her complaint be handled as an Employee Relations matter instead of an EEO matter and retracted her complaint. Def.'s SOMF ¶¶ 68-70; Pl.'s SOMF ¶¶ 67-68. Plaintiff maintains that she decided to retract her EEO complaint under duress because both the General Counsel's office and Jones told her that pursuing her complaint would be detrimental to her career. Pl.'s SOMF ¶ 69. Jones denies these allegations. Def.'s SOMF ¶ 71.

By email to Lofton dated November 14, 2011, plaintiff reinstated her EEO complaint because in her view "the situation had worsened." Def.'s SOMF ¶ 102. Lofton acknowledged receipt of her complaint and requested that plaintiff submit by December 8, 2011 an updated complaint that would reflect the expansion of her claims. Def.'s SOMF ¶ 106. On December 8, plaintiff sent an email to Lofton requesting administrative leave with pay, effective immediately, because the "trauma" she was faced at work was having an "an adverse impact on [her] physical and mental health." Def.'s Mot. Ex. 29 [Dkt. #44-31]. This request was not approved, but plaintiff used her accrued sick leave to take off the following week. Def.'s SOMF ¶¶ 108-09. During that week, Jones re-assigned plaintiff's responsibilities to Eric Malloy. Def.'s SOMF ¶ 113.

On December 14, 2011, plaintiff submitted her revised complaint which alleged

discrimination based on gender, race, and color, hostile work environment, and retaliation. Def.'s SOMF ¶¶ 119-20. Plaintiff's discrimination claims were based on her perception that Jones preferred light-skinned people and men, and that this favoritism affected his treatment of and interactions with plaintiff, a dark-skinned black female; including that he inadequately compensated her, disagreed with her assessment of Kym Wilson ("Wilson"), a light-skinned black woman, and denied her requests for resources to do her job. Def.'s Mot. Ex. 21 [Dkt. #44-23]. To support her claim of a hostile work environment, plaintiff described, inter alia, Jones's micro-management of her work, his use of the term "HNIC"—which is an abbreviation for "head nigger in charge"—, other interactions that plaintiff interpreted as threatening, and Jones's participation in a sexual joke. *Id.* Plaintiff's claims of retaliation rested on her conclusion that Jones directed Wilson to "coach" plaintiff on her interactions with Jones, her relocation to a dirty office, the refusal to increase her salary, the assignment of her duties to someone else during her sick leave, and Jones's refusal to speak favorably about plaintiff at the same time he highlighted the work of a male employee. *Id.*

On December 15, 2011, Lofton confirmed receipt of plaintiff's revised complaint and advised plaintiff that she was being placed on administrative leave with pay pending the investigation and resolution of her complaint. Def.'s SOMF ¶¶ 129-30. Although plaintiff objected to this decision, Lofton explained that in light of plaintiff's earlier request for administrative leave, Howard believed this to be the best recourse. Def.'s SOMF ¶¶ 131-32. Lofton testified that he was aware of other situations in which a

claimant was put on administrative leave and not the accused. Def.'s Mot. Ex. 13 at 130:16-131:6 [Dkt. #45-11]. After conducting an investigation into plaintiff's complaint, Howard concluded that there were insufficient facts to support plaintiff's allegations. Def.'s SOMF ¶¶ 136-37; Pl.'s SOMF ¶¶ 136-37.

On April 2, 2012, plaintiff returned to work. Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. 7 [Dkt. #50] ("Pl.'s Opp'n"). She was terminated that same day. Def.'s SOMF ¶ 164. Defendant maintains that plaintiff was laid off as a part of a Reduction in Force ("RIF") announced in July 2011, which was designed "to assure the continued financial security, quality and efficiency of the University's offices and programs." Def.'s Mot. Ex. 43 at 1 [Dkt. #45-19]. Indeed, since July 2011, more than 450 Howard employees have been terminated as a part of this RIF. Def.'s SOMF ¶ 167. With respect to plaintiff's position, defendant explains that in December 2011 Jones determined that he must lay off additional employees in light of budget concerns. Def.'s SOMF ¶ 150. Based upon a review of his staff and their capabilities, Jones determined that McFadden should be retained and that plaintiff and Stokes should be terminated. Def.'s SOMF ¶¶ 156, 161. Plaintiff asserts that she was placed on administrative leave and ultimately terminated in direct response to her engaging in the EEO grievance process. Pl.'s Opp'n 9-10.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact to be decided with respect to any essential element of the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. *See id.* at 323-24. In evaluating a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmovant, giving it the benefit of all justifiable inferences derived from the evidence in the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmovant's opposition, however, may not rest upon the mere allegations or denials of the pleadings, but must be supported by affidavits or other competent evidence. *Celotex*, 477 U.S. at 324. Thus, by pointing to the absence of evidence sufficient to establish the existence of an element essential to the nonmovant's case, a moving party may succeed on summary judgment. *Id.* at 325.

## ANALYSIS

Defendant moves for summary judgment arguing that plaintiff has failed to establish facts that support her claims for unlawful retaliation, hostile work environment, or discrimination. *See generally* Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. [Dkt. #44-1] ("Def.'s Mem.") I agree.

### A. Unlawful Retaliation Claim

Title VII prohibits employers from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by [Title VII], or

6

because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Although retaliation claims are generally analyzed under the familiar three-step framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), at the summary judgment stage, if the employee has suffered an adverse employment action and if the employer has asserted a legitimate, nondiscriminatory reason for the action, the Court proceeds to the question of discrimination *vel non*. *See Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying this approach to retaliation claims); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). In so doing, the only question before the Court is whether the employee has put forth sufficient evidence for a reasonable jury to conclude that the employer's proffered explanation for the adverse employment action is mere pretext and the employer intentionally discriminated against the employee. *Brady*, 520 F.3d at 493-94; *see also Jones*, 557 F.3d at 678. Summary judgment must be granted for the defendant if the plaintiff fails to "produce sufficient evidence that would discredit [the employer's proffered explanation] and show that the actions were retaliatory." *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008).

Here, plaintiff's retaliation claim fails because no reasonable factfinder could infer from the record that plaintiff's EEO activity was the reason for a materially adverse employment action against her. To be sure, among plaintiff's myriad complaints are two employment decisions that could constitute "materially adverse" employment actions: her

7

placement on administrative leave[2] and her termination.[3] For each of these decisions, however, defendant has articulated a legitimate, non-retaliatory basis. Accordingly, I evaluate plaintiff's evidence that these explanations are merely pretext.

Regarding plaintiff's placement on paid administrative leave, defendant explains that the Howard University EEO Office, in consultation with Howard University's Office of General counsel, determined that placing plaintiff on leave was an appropriate interim remedial measure under Howard's policies and in light of plaintiff's indication that she desired to be placed on administrative leave. Def.'s Mem. 19. Indeed, the record shows that on December 8, 2011, the day plaintiff's revised EEO complaint was due, she requested "administrative leave with pay, effective immediately" citing the "adverse impact" the situation was having on her physical and mental health. Def.'s SOMF ¶ 107. Although Howard initially denied this request, Def.'s SOMF ¶ 108, upon receipt of plaintiff's revised EEO complaint on December 14, 2011, plaintiff was placed on paid

---

[2] Many courts have concluded that placement on administrative leave *with pay* is not an adverse action for purposes of Title VII. *See, e.g., Hunter v. Dist. of Columbia*, 905 F. Supp. 2d 364, 374 (D.D.C. 2012) *aff'd sub nom. Hunter v. Dist. of Columbia Gov't*, No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013) (holding a ten-day period of paid administrative leave that did not result in disciplinary action being taken was not actionable adverse action); *Walker v. Johnson*, 501 F. Supp. 2d 156, 172 (D.D.C. 2007) (forcing an employee to take ten hours of paid administrative leave was not adverse employment action). I need not address this issue here because defendant has proffered an unrebutted, non-discriminatory reason for placing plaintiff on paid administrative leave.

[3] Most of plaintiff's alleged "retaliatory acts"—for example, her relocation to a dirty office and the assignment of her duties to someone else during her sick leave—did not result in the type of objectively tangible harm that makes them actionable under Title VII. *See Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67 (2006) (noting that the anti-retaliation provision of Title VII does not protect an individual from any and "all retaliation, but from retaliation that produces an injury or harm"); *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) (finding that purely subjective harms—for example, dissatisfaction with a reassignment, public humiliation, and loss of reputation—are not adverse actions, but that "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm").

administrative leave, Def.'s SOMF ¶¶ 129-30. Although plaintiff objected to this decision at the time as "punitive and retaliatory," Def.'s SOMF ¶ 131, defendant is quite right that this type of action is contemplated by Howard's policies. Specifically, the Policy and Procedure on Equal Opportunity in Employment and Education Programs and Activities ("EEO Policy") specifically states that during the pendency of an investigation into an employee's complaint, "interim remedial measures . . . may involve either the complainant or the accused . . . and ma[y] include . . . mandatory administrative leave with pay." Def.'s Mem. 19-20. Moreover, Lofton testified that defendant has previously placed complainants on administrative leave. Def.'s Mot. Ex. 13 at 130:16-131:6.

Against this proffered legitimate, non-discriminatory explanation for putting plaintiff on administrative leave, plaintiff offers no evidence of pretext, much less facts demonstrating that the real reason for her mandatory leave was retaliation. Rather, plaintiff asserts, without support, that Howard's express policy notwithstanding, administrative leave with pay has historically only been used for employees suspected of wrongdoing, Pl.'s Opp'n 5, and cites to one instance in which a male employee was reassigned after submitting a complaint, rather than being put on leave, Pl.'s Opp'n 4. Plaintiff, however, does not present any evidence to undermine Lofton's testimony regarding the broader use of administrative leave. Indeed, plaintiff ultimately argues that, given her objection to administrative leave, Howard should have chosen a different course—namely, it should have placed Jones on leave or reassigned her to another department. Pl.'s Opp'n 10. But this Court is not "a super-personnel department that

reexamines an entity's business decisions." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks omitted). Without more, Howard's decision to place plaintiff on paid administrative leave does not support a claim of retaliation.

With respect to plaintiff's termination, defendant explains that plaintiff was terminated as part of Howard's ongoing Reduction in Force ("RIF") and, in particular, to alleviate budgetary concerns in the Office of Human Resources. *See* Def.'s Mem. 23-25. It is undisputed that since 2011, Howard has terminated over 450 employees as part of an ongoing RIF designed to ensure its continued financial security and efficiency. Def.'s SOMF ¶¶ 138, 140, 167. Moreover, it is undisputed that in December 2011, Jones was advised that the Office of Human Resources was over-budget. Def.'s SOMF ¶ 147. According to defendant, Jones determined that part of the reason his office was over budget was that it was top heavy—employing three senior directors. Def.'s SOMF ¶¶ 155-56. Jones concluded, therefore, that the way to bring the office within its allotted budget was to terminate two of these three employees. *See* Def.'s SOMF ¶156. As between plaintiff, Stokes, and McFadden, Jones decided that McFadden's skills and competencies made him the best candidate to retain. Def.'s SOMF ¶¶ 157-61.

To rebut this legitimate business reason for her termination, plaintiff first points out that defendant immediately hired contractors to perform some of her responsibilities, calling this "classic evidence of pretext." Pl.'s Opp'n 13. While a court may find a claim of pretext to be supported when an employee's position was not actually eliminated but merely filled by someone else, hiring a contractor to perform "some" of plaintiff's

responsibilities supports no such inference. Indeed, that Howard employed a lower-cost option to continue some of plaintiff's work actually reinforces the point that budget concerns drove Howard's decision. Plaintiff's next attempt to discredit Howard's asserted, non-discriminatory reason is her contention that, "[i]t is clear that Mr. Jones had improper motivations for his RIF decision, as he was the target of the investigation into Ms. Frett's internal complaint." Pl.'s Opp'n 13. Such conclusory statements of personal opinion and speculation alone are, of course, insufficient to support any reasonable inference of suspect motivation on the part of Howard. *See Pardo-Kronemann v. Donovan*, 601 F.3d 599, 611 (D.C. Cir. 2010); *Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999).[4] Notably absent from plaintiff's arguments regarding pretext is any evidence that she was actually more qualified than McFadden to be the senior director kept in the Office of Human Resources. Accordingly, once again heading our Circuit's warning to avoid "serv[ing] as a super-personnel department," I find that plaintiff's termination was a direct consequence of an entirely legitimate business decision and that plaintiff offers no evidence from which a reasonable jury could conclude otherwise. Thus, plaintiff's retaliation claim must fail.

**B. Hostile Work Environment Claim**

Plaintiff next claims that she was subjected to a hostile work environment because of her gender and skin color. To prevail on this claim, plaintiff must demonstrate that she

---

[4] Elsewhere plaintiff notes that she was terminated the day she returned from paid administrative leave. But "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

11

faced "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). To determine whether plaintiff was subjected to a hostile work environment, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Indeed, the Supreme Court has emphasized that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

To support her hostile-work-environment claim, plaintiff alleges that (1) Jones used and explained the racially-charged term "HNIC" at a team meeting, (2) Jones joined in a sexual joke during a team meeting, (3) due to her proximate location to Jones's office, plaintiff was exposed "on a constant and regular basis to his discriminatory intimidation and ridicule," (4) Jones attempted to restructure plaintiff's department without her input, (5) plaintiff's office was moved in her absence and she was not provided new furniture, and (6) Jones denied plaintiff the thirty percent performance-based bonus allowed for in her contract. Pl.'s Opp'n 15-16.

Putting to the side plaintiff's unspecified, and unsupported, assertion that she faced constant "discriminatory intimidation and ridicule," Pl.'s Opp'n 15, plaintiff merely alleges a smattering of isolated offenses over the course of her employment. These

isolated incidents simply cannot support a hostile-work-environment claim. *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 24 (D.D.C. 2004) ("[T]o sustain a . . . harassment claim, the alleged incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (internal quotation marks omitted)). In rare cases, a single instance of discrimination directed at an employee may be so extreme as to support a hostile-work-environment claim. *See Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *compare Byrd v. Vilsack*, 931 F. Supp. 2d 27, 46 (D.D.C. 2013) (finding use of the term "HNIC" in employee's presence insufficient to sustain a hostile-work-environment claim); *with Ayissi-Etoh*, 712 F.3d at 577 (reversing summary judgment because a reasonable jury could find hostile work environment where, inter alia, plaintiff's boss directed a deeply offensive racial epithet at plaintiff). Plaintiff argues that this is one of those rare situations because of Jones's use of the racially-charged term "HNIC" in her presence. Pl.'s Opp'n 15. While this epithet is undoubtedly offensive, I cannot conclude that its singular use in plaintiff's presence sufficiently affected the conditions of her employment to implicate Title VII. *See Byrd*, 931 F. Supp. 2d at 46 ("[T]he 'mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.'" (quoting *Harris*, 510 U.S. at 21)); *see also Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 62-63 (D.D.C. 2011) (finding plaintiff's

allegations that manager directed the term "nigger" towards him on one occasion and overheard it used on another insufficient to sustain hostile-work-environment claim).

C. **Discrimination Claim**

In her complaint, plaintiff makes claims of skin color and gender discrimination. However, in her opposition to defendant's motion for summary judgment, plaintiff appears to have abandoned her claim of gender discrimination and only nominally defends her skin color discrimination claim. *See* Pl.'s Opp'n 16-17. Rather than addressing defendant's arguments in favor of summary judgment on her discrimination claims, plaintiff merely re-states her own, unsubstantiated observations and conclusions. *Id.* Therefore, the Court will grant summary judgment for the defendant as to these discrimination claims as well. *See Anderson*, 477 U.S. at 248 (stating the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial").

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment is GRANTED. An appropriate order shall accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge